Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/08/2019 09:05 AM CST

State of Nebraska, appellee, v.
Carlos A. Garcia, appellant.
___ N.W.2d ___

Filed March 8, 2019.    No. S-17-1202.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Mental Competency: Appeal and Error.** The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

5. **Effectiveness of Counsel: Appeal and Error.** An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant

was or was not prejudiced by a defense counsel's alleged deficient performance.

6. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

7. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

8. ____: ____. Under the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, the ultimate touchstone is one of reasonableness.

9. **Constitutional Law: Search and Seizure: Warrantless Searches.** Pursuant to the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, searches and seizures must not be unreasonable, and searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

10. **Constitutional Law: Investigative Stops: Search and Seizure: Probable Cause.** The Fourth Amendment guarantee of the right to be free of unreasonable searches and seizures requires that an arrest be based upon probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity.

11. **Police Officers and Sheriffs: Investigative Stops: Probable Cause.** In determining whether there is reasonable suspicion for an officer to make an investigatory stop, the totality of the circumstances must be taken into account.

12. **Warrantless Searches: Probable Cause: Police Officers and Sheriffs.** Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, which would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.

13. **Warrantless Searches.** The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

14. **Police Officers and Sheriffs: Search and Seizure: Arrests.** After an arrest is made, the arresting officer may search an arrestee's person to remove any weapons that he or she might use to resist arrest or to effect his or her escape, or to seize any evidence on the arrestee's person in order to prevent the concealment or destruction of such evidence.

15. **Arrests: Search and Seizure.** The justification for a search incident to a lawful arrest is absent if a search is remote in time or place from the arrest.

16. ____: ____. Inventory searches after an arrest are permissible.

17. **Search and Seizure.** The propriety of an inventory search is judged by a standard of reasonableness, and such search must be performed in accordance with standard operating procedures.

18. ____. Inventory searches must be conducted pursuant to an established routine, because an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.

19. **Search and Seizure: Police Officers and Sheriffs.** Inventory searches are considered reasonable because they serve at least three needs unrelated to criminal investigation: (1) to protect the owner's property while it remains in police custody, (2) to protect police against claims that they lost or stole the property, and (3) to protect police from potential danger.

20. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on a renewed objection, an appellate court considers all evidence, both from the trial and from the hearing on the motion to suppress.

21. **Trial: Testimony: Police Officers and Sheriffs: Search and Seizure.** Testimony of police officers may be used to establish the existence of a standard procedure and that an inventory search was conducted in accordance with that procedure.

22. **Search and Seizure: Evidence.** Evidence which would have been discovered in the course of a lawful inventory search can be admissible under the inevitable discovery doctrine.

23. **Mental Competency: Trial: Sentences: Time.** A trial court can determine a defendant's competency after trial but prior to sentencing, and it is the obligation of the court to do so.

24. **Trial: Pleas: Mental Competency.** A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.

25. **Courts: Trial: Mental Competency.** The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court.

26. **Robbery: Words and Phrases.** To find the element of taking "by putting in fear" under the robbery statute, Neb. Rev. Stat. § 28-324 (Reissue 2016), the finder of fact must determine from the context established by the evidence whether the defendant's conduct would have placed a reasonable person in fear.

27. **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

28. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

29. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

30. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

31. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

32. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, Nathan A. Liss, and, on brief, Joe Meyer for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Carlos A. Garcia was convicted and sentenced for robbery in the district court for Douglas County. Garcia appeals and claims that the district court erred when it admitted into evidence a note that was found in what he asserts was an improper search of his person and when it determined that he was competent to stand trial and for sentencing. He also claims that there was not sufficient evidence to support his conviction, that his trial counsel provided ineffective assistance, and that the court imposed an excessive sentence. We affirm Garcia's conviction and sentence.

## STATEMENT OF FACTS
In the mid-afternoon of October 27, 2015, Brandon Ruser was working as a teller at a bank in Omaha, Nebraska, when a man Ruser would identify at trial as Garcia approached him. Garcia handed Ruser a note that read, "THIS IS A ROBBERY PUT THE MONEY ON THE COUNTER." Ruser testified at trial that when he saw the note, he "[f]roze" out of "[f]ear, panic." Ruser reread the note to be sure he had read it correctly. Thereafter, in accordance with the protocol he had learned in training, Ruser collected the cash that was in his drawer, placed it on the counter, and backed away. After Ruser put the cash on the counter, Garcia picked up the note, put it in his pocket, and left the bank with the cash. It was later determined that $3,579 had been taken from the bank.

After Garcia left the bank, Ruser reported to his coworkers what had happened. Ruser looked outside and saw Garcia get into the front passenger seat of a black Toyota RAV4 that was parked in the bank's parking lot. Ruser could not see the driver well, but he testified the driver "appeared to be a woman. I just saw longer hair." The vehicle slowly backed up and drove

away in a manner that Ruser described as "pretty much as if nothing had happened."

Police officers investigating the robbery learned from witnesses the license plate number for the black Toyota in which Garcia was seen leaving the bank. Using the license plate number, officers learned that the vehicle was registered to Kelli Allison. They went to the address listed for Allison on vehicle license records, and there, they spoke with Allison. Garcia was the father of Allison's two children, and she had had an "on-again-off-again" relationship with him over the years. In October 2015, they were not in an intimate relationship and were not living together, but they were friends, and she was helping him by paying the rent for a motel where he was staying.

Allison told police that earlier in the day on October 27, 2015, she had helped Garcia by driving him to run some errands. As the final errand, Garcia asked Allison to take him to a local bank to cash a check. Allison waited in the parking lot while Garcia went into the bank. He was inside for 5 to 10 minutes before he came back out and got into the car. Allison then drove Garcia back to the motel where he was staying.

Police officers thereafter applied for a warrant to search Garcia's motel room. Preliminary to our discussion of the application for the search warrant, we note that throughout both the application and the search warrant itself, the suspect is sometimes referred to as "Carlos Garcia," but roughly in an equal number of times, he is referred to as "Carlos Gomez." In the discussion below, for the sake of clarity, we refer to "Garcia," but for completeness, it should be noted that in at least some of the instances discussed below, the application or the search warrant actually refers to "Carlos Gomez" rather than to "Carlos Garcia." Alfred S. Orsi, the police officer who prepared the application for the search warrant, explained that this was a typographical error.

As grounds for issuance of the search warrant, Orsi noted, inter alia, information obtained from Allison to the effect that

she had taken Garcia to the bank and thereafter to his motel room. Orsi also noted that officers had gone to the motel and confirmed with the manager that the room identified by Allison was being rented in Allison's name. The manager also stated that in the recent past, he had observed a man fitting Garcia's description going into the room; after being shown a picture of the robbery suspect taken from the bank surveillance video, the manager identified the man in the photograph as the man he had seen going into the room. Orsi further noted in the application that officers had shown Ruser, the bank teller, a photographic lineup that included a picture of Garcia and that Ruser had identified Garcia as the robber.

In the application, Orsi listed various items that were the intended targets of the search. These items included, inter alia, cash, clothing that the robber was described as having worn, and, notably for this appeal, a robbery note "stating something to the effect of 'This is a robbery, put the money on the counter.'" Orsi asserted that the listed items were "concealed or kept in, on, or about the following described place or person." Orsi thereafter gave the address and room number for the motel room and stated that the search location was to include, inter alia, vehicles at the location that were connected to or under the control of the suspect. The application further stated that "said property is under the control or custody of: Carlos GARCIA," and gave a physical description of Garcia. Orsi further requested authorization for a night-time search and a no-knock, no-announce search warrant. Orsi asserted that although no weapon had been shown during the robbery, Garcia had a history of violence which included a prior conviction and incarceration for manslaughter.

Based on Orsi's application, the Douglas County Court issued a search warrant on October 27, 2015. The court set forth the items listed in the application and found that there was probable cause to believe that the items were concealed in the motel room, in vehicles under the control of the suspect, or, inter alia, on "the person of Carlos GARCIA." The search

warrant gave Orsi, "with the necessary and proper assistance," authority "to search the afore described location and/or person, for the purpose of seizing the before described property." The search warrant further gave authority to execute a nighttime search and to enter the premises without knocking or announcing. The warrant required Orsi to make return of the warrant within 10 days.

Orsi conducted a search of the motel room "an hour or two after the warrant and affidavit were signed by the judge." Orsi did not search any vehicles as part of the search of the motel room, because he was "unaware of any vehicles that were associated with [Garcia] at that location." Orsi did not conduct a search of Garcia's person at the time of the search of the motel room or at any other time. Although Orsi interviewed Garcia on October 28, 2015, that interview occurred "[w]ell after the search" of the motel room. After completing the search, Orsi filed in the county court a return and inventory stating that he had served the warrant on October 27. The return and inventory listed various items that were seized pursuant to the warrant, but notably, the items listed did not include a robbery note.

At approximately 1:15 a.m. on October 28, 2015, Derrick Kreikemeier, an Omaha police officer, passed "a blue older model . . . Chevy Suburban or Tahoe" coming from the opposite direction and noted that it was being driven without a front license plate. Kreikemeier was a passenger in a patrol cruiser driven by his partner. As they passed the vehicle, Kreikemeier observed the driver enough to gather a general description of the driver. Kreikemeier and his partner turned around to follow the vehicle and observed that there was also no rear license plate. They then initiated a traffic stop of the vehicle. The vehicle initially stopped, but as Kreikemeier approached the vehicle on foot, the vehicle took off at a high rate of speed. As he was approaching the vehicle, Kreikemeier had seen an in-transit sign in the rear window, but he was not able to read the full date before the vehicle took off. Kreikemeier and his

partner did not attempt to chase the vehicle, because the stop was "just for a traffic offense." However, Kreikemier notified dispatch to put out a broadcast describing the vehicle, stating that it had fled from a traffic stop, and giving its direction of travel.

Later that morning, at approximately 4 a.m., Kreikemier and his partner were notified that officers had seen the described vehicle, and they went to the location where the vehicle had been seen. They spotted the vehicle traveling down a street and began to follow it. Thereafter, the driver parked the vehicle, and Kreikemeier saw a man get out of the driver's-side door and begin to run south. Kreikemeier yelled for the man to stop and began a pursuit on foot. When the man was approximately 20 to 25 feet from the vehicle, he tripped and fell, and Kreikemeier was able to catch the man. After learning that the man was named "Carlos Garcia," Kreikemeier ran a data check and learned that Garcia had a suspended driver's license and that the police robbery unit had issued a "locate" for Garcia for questioning in connection with a robbery.

Kreikemeier observed that the vehicle was the same vehicle he had stopped earlier. Kreiekemeier could not say for certain that Garcia was the same man who was driving the vehicle in the earlier traffic stop, but he observed that Garcia "fit the description" of the driver in the earlier stop. Kreikemeier looked inside the vehicle in order to determine its ownership; he found a bill of sale which indicated that Garcia had purchased the vehicle for $3,100 on October 27, 2015, the day prior to the stop. Kreikemeier and his partner arrested Garcia for driving under suspension and for fleeing the earlier traffic stop, and they took him to police headquarters for questioning by the robbery unit. At the scene of the stop and arrest, Kreikemeier conducted a pat-down search of Garcia for weapons but did not perform a further search at that time.

After they arrived at police headquarters but just prior to an interview of Garcia, Kreikemeier "removed all of . . . Garcia's property from his person." The items that Kreikemeier

removed from Garcia's person included "$348 cash[,] . . . an envelope addressed to [Garcia, and] [i]nside the envelope was a piece of paper with the writing '[T]his is a robbery. Put the money on the counter.'"

Garcia was thereafter arrested in connection with the bank robbery, and on November 16, 2015, he was charged with robbery. Prior to trial, on February 4, 2016, the State filed a motion to determine whether Garcia was competent to stand trial, and on that same day, the court ordered Garcia to submit to a psychiatric evaluation to determine his mental competency to stand trial. After the evaluation was completed, the court held a hearing at which it received into evidence a report dated May 13, 2016, and prepared by a forensic psychiatrist who opined "with a reasonable degree of medical certainty" that "Garcia at this point is competent to stand trial and he can cooperate in a reasonable manner with the court proceedings in his upcoming trial." Based on the report, the court on June 16 found Garcia to be competent to stand trial. In December, shortly before trial was set to begin, Garcia's counsel moved for a new competency evaluation. Based on interactions the court had had with Garcia and interactions the court had observed between Garcia and his counsel, the court overruled the motion. The court determined that the conclusions from the May 13, 2016, evaluation were still valid and that "while [Garcia] has been defiant and uncooperative with his attorney," such behavior did not rise "to the level to warrant an additional competency evaluation."

Also prior to trial, on June 16, 2016, Garcia filed a motion to suppress evidence seized as a result of searches of his person, his residence, his motel room, and his vehicle. Garcia challenged, inter alia, both stops, the issuance and execution of the search warrant, and the search of his person at police headquarters. Both Kreikemeier and Orsi testified at the hearing. Kreikemeier testified, inter alia, that the search of Garcia's person at police headquarters was done because: "When we place them in the interview room, we want to make sure that

they don't have any type of contraband or weapons that they could take in there with them and possibly even destroy or hurt the officer that's going in." Kreikemeier testified that in addition to being sent in for an interview, Garcia was being arrested for driving under suspension and for fleeing to avoid arrest and that when a person is being booked, officers have to take all property off of the person. Kreikemeier testified on cross-examination that the note was folded inside the envelope and that he took the note out of the envelope, unfolded it, and read it. Orsi also testified at the suppression hearing, and on cross-examination, he acknowledged that the application and the search warrant made references to "Carlos Gomez," but he testified that such references were "typographical error" and that any references to "Gomez" were facts related to Garcia.

In an order filed November 22, 2016, the district court overruled Garcia's motion to suppress. With regard to the stops, the court found that the first stop of the vehicle was justified by the lack of license plates and the failure to plainly display the in-transit sign and that the second stop was justified by a reasonable and articulable suspicion that the driver of the vehicle may be involved in criminal activity due to the fact that the vehicle had fled from the first stop.

With regard to the search warrant, the court found that "[a]lthough there were clearly mistakes made in the affidavit and application," the statements were typographical errors and not a false statement made knowingly and intentionally or with reckless disregard for the truth. The court further found that facts and evidence set forth in the affidavit supported a finding of probable cause to search Garcia's person and his motel room.

With regard to the search of Garcia's person at police headquarters, the court noted that the search took place the morning after the search warrant was obtained by Orsi and that Garcia matched the physical description of the person in the search warrant. The court found that "officers had probable cause to arrest [Garcia] for driving under suspension and flight to avoid

arrest" and that the search of Garcia's person was incident to his arrest and "was valid in that the officers had probable cause to arrest him." The court also made reference to the search warrant in connection with its determination that the search of Garcia's person was proper.

Garcia's trial began on January 9, 2017. The State's witnesses at trial included Ruser, the bank teller. Ruser testified, inter alia, that after Garcia handed him the note, he felt:

> Scared. Very panicked. Not knowing if this was where it was going to go. I mean, you hear stories and things. You just never, you know, want it to be one of those horror stories. You just hope that it would go the way you're trained and taught it would go if you follow the procedures properly.

Ruser also testified that he avoided making eye contact with Garcia, because he wanted "to avoid escalation, not sure if that would prompt a reaction" and "[n]ot knowing if the person is dangerous or not . . . if so, eye contact could provoke an attack or an assault." Ruser further testified that after Garcia left the bank, "[t]hat is when the nerves really kicked in. You know, shaking, shortness of breath, those kinds of things."

During Ruser's testimony, the State showed Ruser the note that had been seized in the search of Garcia's person, and Ruser identified it as the note that he was given in the robbery. The State offered the note into evidence, and Garcia objected and renewed his motion to suppress the evidence. The court overruled Garcia's objection and received the robbery note into evidence.

Kreikemeier and Orsi also testified at trial. During his testimony, Kreikemeier identified the note as the one that he found inside an envelope when he searched Garcia's person at police headquarters. Kreikemeier testified that persons going into an interview room were usually searched and items taken out of their pockets before they were placed in the interview room. Orsi testified that he interviewed Garcia at police headquarters and that he had not personally searched Garcia

but that Garcia had been searched by the time Orsi got to the interview room. Orsi further testified: "That's our policy. Anytime before anybody goes into our interview rooms, they need to be thoroughly searched for contraband." Orsi testified he saw the note that was found on Garcia's person and that the wording of the note "precisely matched the wording that was described to me from the clerk."

During a recess in the State's presentation of evidence, outside the jury's presence, Garcia spoke directly to the court rather than through counsel and stated, "I would like to declare a mistrial. I'm not being represented to the best of my ability." After some discussion with the court regarding procedure, Garcia asserted that he was "asking [counsel] to do things, and she's not doing them." The court overruled the motion for mistrial, and the trial proceeded.

At the close of the State's case, Garcia moved to dismiss and the court overruled the motion. Thereafter, Garcia chose to testify. When Garcia took the stand, counsel asked him to give his side of the story in response to the testimony of the State's witnesses regarding the events of October 27 and 28, 2015. Garcia generally refused to respond to the State's evidence and instead stated that he wished to declare a mistrial and that his constitutional rights had been violated. The defense rested without presenting other evidence, and the court overruled Garcia's renewed motion to dismiss.

The jury found Garcia guilty of robbery, and the court accepted the verdict. Prior to sentencing, the court sustained Garcia's motion for a new evaluation to determine Garcia's competency to stand for sentencing. At the sentencing hearing, the court received into evidence a report dated September 29, 2017, in which a forensic psychiatrist opined with a reasonable degree of medical certainty that Garcia was competent to go through sentencing. The court found Garcia competent to be sentenced, and it thereafter sentenced Garcia to imprisonment for 6 to 10 years with credit for time served of 727 days.

Garcia appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

Garcia claims that the district court erred when it (1) admitted the note into evidence and (2) determined that he was competent to stand trial and for sentencing. Garcia also claims that there was insufficient evidence to support his conviction for robbery. Garcia, who has new counsel on appeal, claims that his trial counsel provided ineffective assistance in certain respects that are set forth in greater detail in our analysis. Garcia claims that even if any one of the above-claimed errors standing alone does not require reversal of his conviction, the accumulation of errors does. Garcia finally claims that the district court imposed an excessive sentence.

## STANDARDS OF REVIEW

[1] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Brown, ante* p. 53, 921 N.W.2d 804 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

[2] The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *State v. Martinez*, 295 Neb. 1, 886 N.W.2d 256 (2016).

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

[4,5] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id*.

[6] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

## ANALYSIS

*Admission of Note, Fourth Amendment,
and Inventory Search.*

Garcia first claims that the district court erred when it admitted "specific physical evidence" at trial. Garcia's argument makes clear that his assignment of error relates specifically to the note and his objection to admission of the note based on an alleged violation of his Fourth Amendment rights. Because we conclude the search of Garcia's person that resulted in discovery of the note was not an unconstitutionally unreasonable search, we determine that the court did not err when it admitted the note.

[7-9] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The ultimate touchstone is one of reasonableness. *Id*. Searches and seizures must not be unreasonable, and searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Id*.

We note first that much of the argument by both Garcia and the State centers on the validity of the search warrant and

in particular the fact that both the application and the warrant sometimes refer to "Carlos Gomez" rather than "Carlos Garcia." The warrant focused on a search of the room in which Garcia was staying. Police executed that warrant and filed a return and inventory, and the note was not among the items that was found in the search. Because the note was not found in the search conducted pursuant to the warrant, the validity of the warrant is not relevant to the question whether the note found later on Garcia's person was obtained in violation of Garcia's Fourth Amendment rights.

As noted, Garcia's argument on appeal focuses exclusively on admission of the note, and the note was not obtained in the search that was conducted pursuant to the warrant. Instead, the note was found in a search of Garcia's person that was conducted after he was taken to police headquarters and before he was put into an interview room to be questioned by Orsi regarding the robbery. Therefore, our analysis focuses on Garcia's relevant arguments concerning the events that led to the discovery of the note. Garcia contends that the investigatory stops that led to his arrest and the search of his person at police headquarters were invalid. We reject these arguments.

[10,11] The Fourth Amendment guarantee of the right to be free of unreasonable searches and seizures requires that an arrest be based upon probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity. *State v. Rodriguez*, 288 Neb. 878, 852 N.W.2d 705 (2014). In determining whether there is reasonable suspicion for an officer to make an investigatory stop, the totality of the circumstances must be taken into account. *Id*.

We note that according to the evidence presented at the suppression hearing, the police made two investigatory stops before eventually arresting Garcia. The first was a traffic stop in which the police stopped a vehicle because it did not appear to have license plates or in-transit tags. The vehicle initially stopped but drove away as police were approaching the vehicle. The second stop occurred a few hours later when the police

again saw what they testified was the same vehicle. The police followed the vehicle but did not initiate a traffic stop. Instead, the driver of the vehicle, Garcia, pulled over of his own accord and parked the vehicle. He ran from the vehicle, and the police thereafter seized him. While not a "traffic stop," this was an investigatory stop of Garcia and is analyzed as such.

Garcia argues on appeal that "the traffic stop" was not valid, but it is not entirely clear whether he is taking issue with the first or second stop, or both. As explained below, we treat the first stop as a "traffic stop," and the second encounter as an "investigation stop," and determine that both stops were constitutionally valid. Regarding the first stop, Garcia cites *State v. Childs*, 242 Neb. 426, 495 N.W.2d 475 (1993), in which we held that police did not have reasonable suspicion of criminal activity when they stopped a vehicle to check whether visible in-transit tags were valid, because they did not see anything suspicious or out of the ordinary about the tags. However, after *Childs*, in *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996), we held that police had reasonable suspicion to conduct an investigatory traffic stop of a car's being operated without license plates or in-transit tags. We reasoned in *Bowers* that "[w]hen an officer observes a vehicle without license plates or in-transit tags, a particularized and objective basis exists to justify a reasonable, articulable suspicion that the driver may be criminally avoiding the motor vehicle registration statutes." 250 Neb. at 161, 548 N.W.2d at 731.

The first stop in this case was based on a reasonable suspicion, because before they made the stop, the police officers did not see license plates or visible in-transit tags. The fact that in-transit tags became visible as the police approached the vehicle on foot does not invalidate the reasonable suspicion that justified the initial traffic stop. This traffic stop was investigatory in nature, and it did not become invalid simply because investigation dispelled the initial suspicion.

The second stop occurred after the officers saw the vehicle a second time. They followed the vehicle but did not initiate a

traffic stop. Instead, the driver pulled the vehicle over and ran from the vehicle, and the officers then initiated an investigatory stop. At that time, the officers had reasonable suspicion based on their belief that the vehicle was the same vehicle they had stopped earlier and that had been driven off before they could contact the driver. At the time of the second stop, the police had reason to suspect that the driver associated with the first stop had violated Neb. Rev. Stat. § 28-905(1) (Reissue 2016), which provides: "Any person who operates any motor vehicle to flee in such vehicle in an effort to avoid arrest or citation commits the offense of operation of a motor vehicle to avoid arrest." Garcia argues that at the time of the second stop, the officers were not certain that he had been driving the vehicle at the time of the first stop. However, the police did not need definitive proof that he had been driving; they needed only an articulable suspicion. In this case, Kreikemeier testified that the vehicle was the same vehicle that had fled the first stop. He could not say for certain that Garcia was the same man who had been driving the vehicle at the time of the earlier traffic stop, but he observed that Garcia "fit the description" of that driver. This was sufficient to establish an articulable suspicion of criminal activity.

[12] After the second stop, police learned that Garcia's driver's license was suspended. They therefore arrested Garcia for driving under suspension and fleeing the earlier traffic stop. Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, which would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *State v. Petsch*, 300 Neb. 401, 914 N.W.2d 448 (2018). Garcia does not explicitly argue on appeal that the police did not have probable cause to arrest him for driving under suspension. He argues that there was not probable cause to arrest him for fleeing the earlier stop, because the police could not say with certainty that he had been driving the vehicle at the earlier time.

However, Kreikemeier's testimony that Garcia "fit the description" of that driver, combined with knowledge obtained in connection with the second stop—particularly the fact that Garcia was driving on a suspended license and that he attempted to run from the police after stopping the second time—gave sufficient reason to suspect he had committed the crime of fleeing to avoid arrest.

Having determined that the stops and the arrest were valid, we consider whether the search of Garcia's person during which the note was discovered was valid. As we discussed earlier, the note was not discovered as part of the search that was conducted in execution of the search warrant. The search of Garcia's person at police headquarters was therefore a search without a warrant. We determine that the search which led to the discovery of the note was valid.

[13] As noted above, to be constitutional, searches and seizures must not be unreasonable, and searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The warrantless search exceptions we have recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). The district court's order which overruled Garcia's motion to suppress and the State on appeal indicate that we should approve the search by which the note was discovered as a search incident to a valid arrest. However, as explained below, we believe the controlling framework is the inventory search exception to the warrant requirement and we determine the search was valid on this basis.

[14,15] Regarding a search incident to arrest, we have stated that a valid arrest based on probable cause that a person is engaged in criminal activity is allowed by the Fourth Amendment, and if an arrest is made based upon probable

cause, a full search of the person may be made incident to that arrest. *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2016). As we determined above, the police in this case made a valid arrest of Garcia. After an arrest is made, the arresting officer may search an arrestee's person to remove any weapons that he or she might use to resist arrest or to effect his or her escape, or to seize any evidence on the arrestee's person in order to prevent the concealment or destruction of such evidence. See *State v. Wells, supra*. However, we have noted that the justification for a search incident to a lawful arrest is absent if a search is remote in time or place from the arrest. *State v. Roberts*, 261 Neb. 403, 623 N.W.2d 298 (2001). As Garcia notes, in this case, the police conducted a pat-down search at the time they arrested Garcia, but that search did not disclose the note. The search that disclosed the note did not occur until Garcia had been taken to police headquarters and was being prepared to go into an interview, arguably remote in time and place from the arrest.

[16-18] We need not resolve the propriety of the search as incident to an arrest, because another recognized exception to the warrant requirement is an inventory search, and we believe that the search was valid as an inventory search. In our recent case law, we have more frequently analyzed the inventory search exception in connection with the search of a vehicle. See, e.g., *State v. Nunez*, 299 Neb. 340, 907 N.W.2d 913 (2018). But we have recognized that searches of an arrestee's person and effects may be justified as inventory searches. In *State v. Newman*, 250 Neb. 226, 237-38, 548 N.W.2d 739, 749 (1996), we noted that both this court and the U.S. Supreme Court, in *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983), had "consistently held that inventory searches after an arrest are permissible." In *State v. Filkin*, 242 Neb. 276, 494 N.W.2d 544 (1993), we held that police had performed a permissible inventory search of the defendant's purse after her arrest. We further stated in *Filkin* that "the propriety of inventory searches is judged by a standard

of reasonableness" and that "such searches must be performed in accordance with standard operating procedures." 242 Neb. at 279, 494 N.W.2d at 547. We stated that inventory searches must be conducted pursuant to an established routine, because "'an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.'" *Id.* at 282, 494 N.W.2d at 549.

[19] Similarly, in connection with an inventory search of a vehicle, we recently stated that "inventory searches conducted according to established policy are reasonable" and that

> [i]nventory searches are considered reasonable because they serve at least three needs unrelated to criminal investigation: (1) to protect the owner's property while it remains in police custody, (2) to protect police against claims that they lost or stole the property, and (3) to protect police from potential danger.

*State v. Nunez*, 299 Neb. at 346, 907 N.W.2d at 917.

[20] In the present case, we consider the testimony of the police officers at the suppression hearing and at the trial. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017) (instructing that when motion to suppress is denied pretrial and again during trial on renewed objection, appellate court considers all evidence, both from trial and from hearing on motion to suppress). A review of all such testimony indicates that the search of Garcia's person that uncovered the note was conducted after he was taken to police headquarters and before he was put into a room to be interviewed by an officer investigating the robbery. Kreikemeier, the officer who conducted the search, testified about the purposes for which the search was done. He testified that before placing a person into an interview room, police search the person "to make sure that they don't have any type of contraband or weapons that they could take in there with them and possibly even destroy or hurt the officer that's going in." He testified that Garcia was being arrested and that when a person was being booked, officers would take all property off the person. Orsi, the officer who

conducted the interview, testified that police policy in particular was that "before anybody goes into out interview rooms, they need to be thoroughly searched for contraband."

[21] Such testimony by the police officers indicates that the search of Garcia's person was conducted pursuant to police policy. In *State v. Filkin, supra*, we indicated that the Fourth Amendment requires that "the State bears the burden of proving that a law enforcement agency's search was made pursuant to a standardized criteria or established routine" and that the testimony of police officers may be used to "establish the existence of a standard procedure and that the search was conducted in accordance with that procedure." 242 Neb. at 284-85, 494 N.W.2d at 550.

[22] For completeness, we note that even if Garcia was not in the process of being booked at the moment of the search, the evidence shows that he had been arrested and was eventually going to be booked. The testimony established that an inventory search was standard procedure upon booking, and so the note would have been discovered in that search. We have recognized that "evidence which would have been discovered in the course of a lawful inventory search can be admissible under the inevitable discovery doctrine." *State v. Ball*, 271 Neb. 140, 152, 710 N.W.2d 592, 603 (2006).

We conclude that the search of Garcia's person that uncovered the note was justified as an inventory search. Because we determine that the note was not obtained as the result of an unconstitutional search or seizure, we conclude that the court did not err when it admitted the note into evidence. We reject Garcia's assignment of error.

*Competency Determinations.*

Garcia next claims that the district court erred when it determined that he was "competent to proceed legally to trial and to sentencing." We conclude that the court did not err in these two rulings. And for completeness, we also reject Garcia's argument that his courtroom behavior should have separately and additionally led to a finding of incompetence.

[23] Neb. Rev. Stat. § 29-1823(1) (Cum. Supp. 2018) states in part that "[i]f at any time prior to trial it appears that the accused has become mentally incompetent to stand trial, such disability may be called to the attention of the district or county court by the county attorney or city attorney, by the accused, or by any person for the accused." We have also recognized that a trial court can determine a defendant's competency after trial but prior to sentencing and that it is the obligation of the court to do so. See *State v. Martinez*, 295 Neb. 1, 886 N.W.2d 256 (2016). In the present case, the court twice found Garcia to be competent—on the State's motion prior to trial and on Garcia's motion after conviction but before sentencing.

[24,25] A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018), *disapproved on other grounds, State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018). The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. *State v. Fox*, 282 Neb. 957, 806 N.W.2d 883 (2011). The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *State v. Martinez, supra*; *State v. Fox, supra*.

The court in this case first determined that Garcia was competent prior to trial in response to the State's motion. The record shows that the court ordered a psychiatric evaluation. An evaluation was completed, and a report dated May 13, 2016, by a forensic psychiatrist was received into evidence. The court found Garcia to be competent to stand trial based on the report of the forensic psychiatrist who performed the evaluation. In the report, the forensic psychiatrist opined "with a reasonable degree of medical certainty" that "Garcia at this point is competent to stand trial and he can cooperate in a reasonable manner with the court proceedings in his upcoming

trial." The report noted that Garcia had been diagnosed with "Antisocial Personality Disorder." However, the psychiatrist noted that Garcia was "able to tell me that he could very well understand the nature of the alleged charges against him"; that Garcia was familiar with the people who would be involved in the upcoming court proceedings, including the judge, the State's attorney, and the public defender, and the roles each would play in the proceeding; and that he understood procedural aspects of a trial including the need to work with his attorney to prepare for trial, the process of plea bargaining, the difference between a bench trial and a jury trial, and the role and composition of a jury.

After he was convicted but prior to sentencing, Garcia filed a motion for a new evaluation to determine his competency to stand for sentencing. The court sustained the motion, and at the sentencing hearing, the court received into evidence a report dated September 29, 2017, which was prepared by the same forensic psychiatrist who had performed the evaluation prior to trial. The psychiatrist opined with a reasonable degree of medical certainty that Garcia was not suffering from any psychotic disorder and was competent to go through the process of sentencing. The psychiatrist noted that Garcia's current diagnosis was "malingering as well as antisocial personality disorder." The psychiatrist further noted that although Garcia had "reported some delusional thinking," Garcia had refused "to take any psychotropic medication" or to participate in "non-intrusive psychological testing." The psychiatrist opined that Garcia "knows well that taking any psychological testing, as it was the case in the past, will reveal his malingering and his efforts of avoiding punishment for the crime that he has committed." Based on the forensic psychiatrist's report, the court found Garcia competent to be sentenced.

We conclude that there was sufficient evidence to support the court's findings of competency prior to trial and prior to sentencing. At the competency hearing prior to trial, Garcia did not present any evidence or argument to dispute the forensic

psychiatrist's May 13, 2016, report. Instead, defense counsel stated that Garcia "pretty much agrees with most of the observations and conclusions" in the report and that he had "no disagreement with the conclusion that at the current time he is able to assist in his defense and is competent to stand trial." At the sentencing hearing, after the State offered the forensic psychiatrist's September 29, 2017, report into evidence, Garcia had no objection and presented no evidence or argument to dispute the substance of the report. In view of the foregoing, we believe the record shows that the State presented evidence which established Garcia's competency to stand trial and for sentencing, that Garcia presented no evidence to dispute the State's evidence, and that the court's findings of competency are based on sufficient evidence. We therefore conclude that the court did not err when it found Garcia competent to stand trial and for sentencing.

For completeness, we note that much of Garcia's argument in his brief focuses on a contention that during trial, Garcia "exhibited signs of mental instability consistent with suffering the negative consequences of an active mental illness." Brief for appellant at 22. Garcia asserts that such signs consisted mainly of "numerous incoherent outbursts during in-court proceedings." *Id.*

Garcia's argument is outside the scope of his assigned error addressed to the court's two rulings discussed above, but we note that in December 2016, shortly before trial was set to begin, Garcia's counsel moved for a new competency evaluation. In response, the court overruled the motion based on its own interactions with Garcia and interactions the court had observed between Garcia and his counsel. The court determined that the conclusions from the May 13, 2016, evaluation were still valid and that "while [Garcia] has been defiant and uncooperative with his attorney," such behavior did not rise "to the level to warrant an additional competency evaluation."

We have stated that "[a] defendant's derangement . . . is not sufficient to prove incompetence to stand trial." *State v.*

*Grant*, 293 Neb. 163, 195, 876 N.W.2d 639, 664-65 (2016). In *Grant*, we determined that the defendant's "mere impulsive behavior during trial [was] not sufficient to raise the issue of incompetence" when an evaluation conducted prior to trial had shown him to be competent to stand trial. 293 Neb. at 195, 876 N.W.2d at 665. The behavior of the defendant in *Grant* included "outburst[s]" as well as an incident in which he allegedly "hit one of the court deputies" and another incident in which he "struck his defense attorney in the presence of the jury." 293 Neb. at 174-75, 876 N.W.2d at 653. Based on *Grant*, we determine that to the extent Garcia complains of error, the court did not err when it overruled Garcia's December 2016 motion to determine competency.

## Sufficiency of the Evidence.

Garcia next claims that there was insufficient evidence to support his conviction for robbery. We conclude that the evidence was sufficient to sustain the conviction.

Garcia was convicted of robbery in violation of Neb. Rev. Stat. § 28-324 (Reissue 2016), which provides that one "commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Garcia argues that there was no evidence that he used force or violence. However, § 28-324 provides that robbery may be committed "forcibly and by violence" or "by putting in fear." In the present case, we conclude that there was evidence that Garcia took money from the person of another "by putting [the victim] in fear."

The evidence showed that Garcia walked into a bank and handed a teller a note that read, "THIS IS A ROBBERY PUT THE MONEY ON THE COUNTER." The teller testified that upon reading the note, he "[f]roze" out of "[f]ear, panic." The teller further described his reaction as being "[s]cared" and "[v]ery panicked" and that he was uncertain whether Garcia was dangerous and whether making eye contact with Garcia

"could provoke an attack or an assault." The teller testified that he collected the cash that was in his drawer, then placed it on the counter and backed away, and that Garcia picked up the note and left the bank with the cash.

Nebraska's robbery statute, § 28-324, includes the element of taking by "putting [the victim] in fear." Whether to apply an objective test to the "putting in fear" aspect of robbery has long been discussed. See Wayne R. LaFave, Criminal Law § 20.3(d)(2) (6th ed. 2017). Florida has a robbery statute which, like Nebraska's statute, includes an element of "putting in fear." See Fla. Stat. Ann. § 812.13(1) (West 2016). In *Delgado v. State*, 105 So. 3d 612, 613 (Fla. App. 2013), the Florida appellate court stated that "for there to be a 'fear'-based robbery within the meaning of the statute, the trier of fact must determine whether the defendant's conduct would have placed a reasonable person, not just the actual victim, in fear." This analysis gives due regard to whether "the defendant's behavior [was] calculated to produce" fear. See LaFave, § 20.3(d)(2) at 1325. In *Delgado*, the court specifically determined that the defendant put a bank teller "in fear" when he handed her a note stating "'this is a robbery'" and demanded money. 105 So. 3d at 613.

Other jurisdictions have statutory provisions similar to Nebraska's "putting in fear" element but phrased in terms of a "threat of force" or "intimidation." Regardless of the specific statutory language, when there is evidence of a robbery note, the context surrounding the incident will be taken into account. In *Washington v. Farnsworth*, 185 Wash. 2d 768, 374 P.3d 1152 (2016), the court determined that a handwritten note demanding money from a bank teller contained an implied threat of force. In *Farnsworth*, the court reasoned a threat was present in the context of that case, because the demand for money was "'unsupported by even the pretext of any lawful entitlement to the funds.'" 185 Wash. 2d at 779, 374 P.3d at 1158 (quoting *State v. Collinsworth*, 90 Wash. App. 546, 966 P.2d 905 (1997)). See, also, *United States v. Hopkins*, 703 F.2d 1102,

1103 (9th Cir. 1983) (finding sufficient "intimidation" for robbery when defendant presented teller note stating "'[t]his is a robbery'" and demanding money). See, also, LaFave, *supra*.

[26] We agree with the reasoning of the foregoing authorities. Merging the principles just recited, we hold that to find the element of taking "by putting in fear" under the robbery statute, § 28-324, the finder of fact must determine from the context established by the evidence, whether the defendant's conduct would have placed a reasonable person in fear. In the present case, the context includes a robbery note.

We apply the foregoing legal standard to the evidence in this case. The evidence showed that Garcia walked into a bank and handed the teller a note that stated, "THIS IS A ROBBERY PUT THE MONEY ON THE COUNTER." The teller described the incident in detail in addition to his reaction. We determine that the evidence was sufficient to establish the statutory requirement that Garcia committed robbery by "putting [the victim] in fear." See § 28-324.

The evidence in this case was sufficient to support a conviction for robbery in violation of § 28-324. We therefore reject Garcia's claim that his conviction was not supported by sufficient evidence.

*Ineffective Assistance Claims.*

[27] Garcia, who has new counsel on appeal, claims that his trial counsel provided ineffective assistance in certain respects. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). Garcia specifically claims he was provided ineffective assistance when trial counsel (1) failed to obtain a second opinion regarding his mental illness, (2) failed to move for a mistrial when his mental illness disrupted trial

proceedings, (3) failed to present a meaningful defense, and (4) failed to seek a dismissal prior to trial based on a violation of Neb. Rev. Stat. § 29-1207 (Reissue 2016), the speedy trial statute. We determine that the record on direct appeal is insufficient to consider the first two claims, that the third claim is not sufficiently stated, and that the record shows that the fourth claim is without merit.

[28,29] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Golyar, supra*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

In his first two claims of ineffective assistance, Garcia asserts that trial counsel failed to obtain a second opinion regarding his mental illness and failed to move for a mistrial when his mental illness disrupted trial proceedings. He alleges that counsel had firsthand knowledge of Garcia's mental illness and how manifestations of such illness interfered with attorney-client communications and Garcia's ability to assist in preparations for trial. He claims that counsel relied on mental health evaluations requested by the State and failed to obtain an independent second opinion that would have shown that Garcia's mental illness undermined his ability to meaningfully participate in his defense. He further claims that counsel should have moved for a mistrial. The State in its response does not dispute that Garcia set forth these claims with sufficient particularity, but it asserts that the record on appeal is not sufficient to consider the claims.

We agree that the record on appeal is not sufficient to consider these first two claims. As we discussed above in

connection with Garcia's claim that the court erred when it found him to be competent to stand trial and for sentencing, the court based such determinations on mental health evaluations obtained by the State. Garcia's first two claims of ineffective assistance would require Garcia to show that counsel could have obtained a second opinion that would have called the State's evaluations into doubt. These claims also involve consideration of trial strategy, which cannot be done on direct appeal. Although we determine the claims cannot be reviewed on direct appeal, we determine that Garcia alleged deficient performance with sufficient particularity for purposes of direct appeal.

In his third claim of ineffective assistance, Garcia asserts that trial counsel "failed to present a meaningful defense case-in-chief." He argues that the defense was limited to adducing testimony from Garcia in his own defense, and he criticizes counsel for "putting Garcia's mental illness on full display for a jury" when counsel was not pursuing a defense of not guilty by reason of insanity. Brief for appellant at 32. Garcia argues that the defense presented by counsel, "including counsel's failure to pursue a defense rooted in a theory of not guilty by reason of insanity," was not a reasonable strategic choice but instead was ineffective assistance evident on the face of the record. *Id*. The State asserts in response that Garcia did not raise this claim with sufficient particularity; the State argues that Garcia does not specify what evidence should have been presented or what defense theory counsel should have pursued.

We agree with the State that Garcia did not state his third claim with sufficient particularity. Garcia does not specify any additional evidence that should have been presented by defense counsel or that would have supported an insanity defense. Instead, he argues that ineffectiveness for failure to present such defense is evident from the record on appeal. As we have discussed above with regard to Garcia's assignment of error regarding the court's competency evaluation, the record

supports the district court's determination that Garcia was competent to stand trial and sentencing. Because the record supports a competency determination, a fortiori the record does not clearly show that counsel should have pursued an insanity defense. In order to support a claim that counsel was ineffective for failing to pursue such a defense, Garcia cannot rely on the record on appeal and instead would need to allege with specificity what evidence would support such defense. He failed to do so, and we therefore conclude that the record on appeal does not support this third claim, and Garcia did not state the claim with sufficient particularity to preserve it for postconviction review.

In his fourth and final claim of ineffective assistance, Garcia asserts that counsel was ineffective for failing to seek a dismissal prior to trial based on a violation of the speedy trial statute. Nebraska's speedy trial statute, § 29-1207(1), provides that a person "indicted or informed against for any offense shall be brought to trial within six months" as calculated under the statute; § 29-1207(2) generally provides that the 6-month period shall commence on the date the information is filed; and § 29-1207(4) provides for certain periods of time that shall be excluded in calculating the time for trial. Garcia states that the State filed the information against him on November 16, 2015, and proceeded to trial on January 9, 2017. Garcia argues that this period of time, "including exceptions pursuant to § 29-1207(4)," is greater than the 6 months allowed under the statute. Brief for appellant at 33. Although his argument appears to recognize there were periods of time that were excludable under § 29-1207(4), Garcia does not specify any such periods and does not specify or dispute any periods that the court or the State may have characterized as excludable.

The State argues in its response that there were at least two excludable periods that extended the 6-month period such that the statute was not violated. The State agrees that the information was filed on November 16, 2015, and that Garcia was

brought to trial on January 9, 2017. But, the State asserts, the record shows that "from February 4, 2016, until June 16, 2016, Garcia's competency was at issue" and that "from June 16, 2016, until November 22, 2016, there was a pending motion to suppress for the district court to rule on." Brief for appellee at 22. The State asserts that such periods total 292 days; that the periods are excludable under § 29-1207(4); that excluding such periods extended the deadline to bring Garcia to trial to March 4, 2017; and that therefore, Garcia was timely brought to trial on January 9, 2017.

The record on appeal is consistent with the State's recitation of events. The record shows that the information was filed on November 16, 2015, and that the trial started on January 9, 2017. The record also shows that on February 4, 2016, the State filed a motion for an order to require Garcia to submit to a psychiatric examination in order to determine his competency to stand trial. On that same day, the court filed an order requiring the examination. On June 16, the court filed an order finding Garcia to be competent. Also on June 16, Garcia filed a motion to suppress evidence obtained as a result of searches of his person and his property. The court filed an order on November 22 overruling Garcia's motion to suppress.

Section 29-1207(4)(a) provides that the time periods that shall be excluded in computing the time for trial include, inter alia, "[t]he period of delay resulting from . . . an examination and hearing on competency" and "the time from filing until final disposition of pretrial motions of the defendant, including motions to suppress evidence." Therefore, under § 29-1207(4), both the time period from February 4, 2016, when the State moved for and the court ordered an examination to determine competency, through June 16, when the court found Garcia to be competent, and the time period from June 16, when Garcia filed his motion to suppress, through November 22, when the court overruled the motion, are to be excluded in computing the time for trial.

Furthermore, although the State does not rely on it, we note that the record indicates that the court filed an order on December 7, 2016, in which it stated that this matter had come on for jury trial on December 5, but that Garcia had moved to continue the trial. After advising Garcia that if continuance were granted the time until trial would not count against the State for speedy trial purposes, the court continued the trial to January 9, 2017. Section 29-1207(4)(b) provides that the time periods that shall be excluded in computing the time for trial include "[t]he period of delay resulting from a continuance granted at the request or with the consent of the defendant or his or her counsel."

We agree with the State that the two periods identified by the State were to be excluded under § 29-1207(4) and that excluding such periods, even without considering the continuance requested by Garcia, Garcia was brought to trial within the 6 months allowed under § 29-1207. Therefore, the record on appeal refutes Garcia's fourth claim of ineffective assistance of counsel.

In sum, we conclude that Garcia's first two claims of ineffective assistance of trial counsel cannot be reviewed on direct appeal but that they were stated with sufficient particularity to be preserved for postconviction review. We further conclude that Garcia's third claim of ineffective assistance of trial counsel was not stated with sufficient particularity to be considered on direct appeal or to be preserved for postconviction review. We finally conclude that the record on appeal shows that Garcia's fourth claim of ineffective assistance of trial counsel is without merit.

*Cumulative Error.*

Garcia claims that even if none of the alleged errors discussed above was in itself sufficient to warrant reversal of his conviction, the cumulative effect of such alleged errors requires reversal. We have recognized that although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the

defendant of his constitutional right to a public trial by an impartial jury. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). However, as discussed above, we find no error and therefore Garcia's argument that cumulative error deprived him of his right to a fair trial is without merit.

*Excessive Sentence.*

Garcia finally claims that the district court imposed an excessive sentence. We conclude that the district court did not abuse its discretion in sentencing Garcia.

Robbery is a Class II felony under § 28-324(2). Under Neb. Rev. Stat. § 28-105 (Reissue 2016), a Class II felony is subject to a sentence of imprisonment for a minimum of 1 year and a maximum of 50 years. Therefore, Garcia's sentence of imprisonment for 6 to 10 years was within statutory limits, and we review his sentencing for an abuse of discretion by the district court.

[30-32] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Garcia generally argues that the district court did not place sufficient emphasis on mitigating factors such as "the mild nature of the robbery" and Garcia's "unaddressed mental health

issues." Brief for appellant at 36. Garcia argues that the court did not explicitly address certain relevant factors identified in our case law and set forth above, such as his age, education and experience, and social and cultural background.

Garcia also argues that the court failed to explicitly analyze the factors set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2016) and that therefore the court "unfairly deprived Garcia of a just sentence." Brief for appellant at 37. Although Garcia's argument appears to focus on the length of his sentence, we note that § 29-2260(2) and (3) set forth factors a court should consider when deciding whether to withhold a sentence of imprisonment and instead impose a sentence of probation. We further note that we have said that § 29-2260 is a directive to the trial court as to the factors to be considered in imposing the sentence but that it contains no requirement that the court make specific findings. *State v. Hunt*, 214 Neb. 214, 333 N.W.2d 405 (1983). Therefore, the court's alleged failure to explicitly analyze the § 29-2260 factors is not in itself error or grounds for reversal; however, we do consider the applicable factors from § 29-2260 and from case law in reviewing whether the court abused its discretion in sentencing.

At the sentencing hearing in this case, the court set forth various factors it had considered in determining Garcia's sentence, including his age and the nature of the current offense. With regard to the current offense, the court specifically noted the testimony of witnesses at the bank regarding "the fear that they experienced." The court also noted Garcia's prior criminal history, which the court noted included violent offenses and showed that Garcia had not "gone for very lengthy periods of time without having entries on [his] record." The court particularly noted that Garcia had been convicted of manslaughter, for which he had been sentenced to imprisonment for 15 to 20 years, and that after he was paroled on that conviction, his parole was revoked. The court also noted Garcia's mental health issues and stated that such issues needed to be addressed. The court stated that Garcia had a

"need for rehabilitation" but had been resistant to past reha-
bilitation efforts; the court expressed hope that while serving
the sentence imposed in this case, Garcia would make himself
available to "what programs are offered through the Nebraska
Department of Correctional Services."

Our review of the record in this case indicates that the court
considered relevant factors, and the record does not indicate
that the court considered any improper factors. We further
note that Garcia's sentence of imprisonment for 6 to 10 years
is at the lower end of the statutory range of 1 to 50 years.
We determine the sentence imposed by the court was within
its discretion, and there is no indication in the record that the
court abused its discretion. We therefore reject this assignment
of error.

## CONCLUSION

We conclude that the district court did not err when it admit-
ted the note into evidence or when it determined that Garcia
was competent to stand trial and for sentencing. We further
conclude that there was sufficient evidence to support Garcia's
conviction for robbery and that the district court did not abuse
its discretion in sentencing Garcia. We finally conclude with
regard to each of Garcia's claims of ineffective assistance of
trial counsel that the claim either is without merit or is not suf-
ficiently stated or that although the claim is sufficiently stated
for postconviction review, it cannot be reviewed on direct
appeal. We therefore affirm Garcia's conviction and sentence
for robbery.

AFFIRMED.