IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. BELINA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TRAVIS BELINA, APPELLANT.

Filed October 21, 2025.    No. A-24-480.

Appeal from the District Court for Madison County: MARK A. JOHNSON, Judge. Affirmed.

Adam J. Sipple, of Sipple Law, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Travis Belina appeals from his jury convictions in the Madison County District Court of two counts of child abuse, two counts of third degree sexual assault, one count of attempted third degree sexual assault, and three counts of solicitation of a minor. Belina generally argues that the evidence was insufficient to sustain certain convictions; the district court erred in instructing the jury and failing to provide a limiting instruction, overruling Belina's objections to certain evidence, and allowing the State to make improper remarks during closing arguments; and that his trial counsel was ineffective. For the reasons stated herein, we affirm Belina's convictions and sentences.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

This appeal arose from allegations that Belina solicited three high school students, C.K., B.C., and T.S., to perform sexual acts in exchange for money or other things of value; subjected C.K. and B.C. to nonconsensual sexual contact; and attempted to subject another victim, W.H., to sexual contact. Belina employed the victims at a feedlot he owned and operated.

On August 27, 2022, Captain Jon Downey was assigned to investigate allegations of sexual abuse involving Belina. Following interviews with C.K. and B.C., Belina was arrested on August 29. Captain Downey interviewed W.H. shortly after Belina's arrest. Thereafter, Belina was charged with two counts of child abuse, both Class IIIA felonies; two counts of third degree sexual assault, both Class I misdemeanors; three counts of solicitation of a minor, all Class IV felonies; and attempted third degree sexual assault, a Class II misdemeanor. See, Neb. Rev. Stat. § 28-707 (Reissue 2024) (child abuse); Neb. Rev. Stat. § 28-320 (Reissue 2016) (third degree sexual assault); Neb. Rev. Stat. § 28-801.01 (Reissue 2016) (solicitation of a minor); Neb. Rev. Stat. § 28-201(1)(B) (Reissue 2016) (criminal attempt).

### 2. TRIAL

The trial was held over 5 days in April 2024. The evidence established that C.K. was born in December 2005; B.C. was born in November 2005; T.S. was born in September 2004; and W.H. was born in May 2006.

### (a) Victims' Testimony

#### *(i) C.K.'s Testimony*

C.K., who was 18 years old at the time of trial, worked at Belina's feedlot in 2021 until July 27, 2022. C.K. testified that during that time Belina regularly provided alcohol on the job site and often gave him a beer after a long day of work. C.K. believed he developed a drinking problem during the time he worked at Belina's feedlot.

According to C.K., after about 3 months of working at the feedlot, Belina "would come by and rub my neck and just tell me how good of a job I was doing out there. And if I wore a cutoff, he'd a lot of times come by and grab my belly or rub my belly and stuff like that." C.K. testified that the first time Belina had sexual contact with him, he and Belina were checking on cows in a field. C.K. testified that Belina gave him a beer and after they entered the gate to the field, Belina stopped the vehicle and asked C.K. if he wanted to give Belina a backrub. C.K. responded "no, I don't do that. I don't believe in that" and attempted to open the vehicle's door but it had been locked by Belina. Belina then told C.K. to get in the backseat of the vehicle,

> [s]o I climbed over the backseat. Got in the back, sat my back up against the left side of the [vehicle] and [Belina] came back there and laid on the ground and started telling me what to do like how to rub his back and how he wanted it. How he liked it. And then he told me, like, whatever I do to you, you do to me . . .
>
> . . . .

- 2 -

So he kind of forcely [sic] started taking my hand -- and he actually started rubbing on me first, rubbing my neck and my back, same old things that has been happening previously before this incident happened.

And as it went on and on, you know, he started touching more and more and telling me what to do. Put his hand in my waistband, was rubbing around there, touching my butt, [and] grabbed my penis.

C.K. testified that the sexual touching stopped after he received a call from his mother telling him to come home. As Belina was driving C.K. home, C.K. exited the vehicle to open and close the gate to allow the vehicle to drive through. When C.K. re-entered the vehicle, he testified that there was $100 waiting for him and Belina told him not to tell anyone and to "keep this quiet."

C.K. testified that the sexual touching occurred more than once and that Belina would generally state, "well, you got your socks on so it ain't gay" or "no homo." C.K. testified that another time after Belina asked him to help check the cows, when they were in the pasture, Belina touched him sexually. C.K. testified that, although he

told [Belina] that [B.C.] would rather go with him, because I was hoping that I wouldn't have to be put in that situation again. I didn't know if he was just doing that to me or anything. And so I was hoping that if I stayed out of it nothing was going to happen to anyone else, right? And I was going to stay quiet. Well, then [Belina] told me to have both of us come along and I was like, okay, well, [if B.C.] is there then nothing should happen.

C.K. testified that, on this occasion, he attempted to warn B.C. about Belina's earlier conduct but B.C. did not believe him.

After arriving at the field, C.K. exited the vehicle to open the gate, and when he got back in the vehicle, Belina told B.C. to drive around and check the fence for broken wires. C.K. testified that Belina got in the back of the vehicle with him and started "rubbing up on me, grabbing my neck . . . scratching my head, telling me to scratch his head, rub his back. . . he put his hand in my waistband, trying to undo my buckle. Played with my penis, and then he wanted me to play with his penis." Belina then told B.C. to stop driving and get in the back and told C.K. to drive. C.K. testified that, after this incident, Belina gave both him and B.C. $200 and "pretty much said be quiet."

C.K. testified that on another occasion, when Belina had C.K. go up to check bales with him, Belina "told me to get in [the vehicle] . . . that we're going to go drive around until the truck comes." C.K. testified that he told Belina to

[s]top touching me. I'm over it. He goes, oh, you don't like this? I said, no, I've never liked this. I don't like it, never have. I don't want to do it. So I made it pretty clear to him a lot of times that I did not like him touching me.

C.K. testified that Belina continued to try and touch him, and that Belina pulled down his own pants until he saw someone arriving to drop off bales. Although C.K. testified that Belina did not touch his penis on this occasion, Belina made him touch Belina's penis.

C.K. testified to another occasion when he, B.C., T.K., and Belina went to pick up and haul a pickup truck somewhere past Albion, Nebraska. After they loaded the pickup on the trailer, they

stopped for food. On the way home, C.K. testified that Belina had B.C. drive and Belina got in the back with him. C.K. testified that Belina kept whispering to C.K. what he wanted C.K. to do to him. C.K. testified that he said "no" and

> finally [Belina] got upset about it and he told me to start scratching his head. And he took his hand and put my hand on his head and told me what to do. So I was started scratching his head and rubbing his neck. And then he put his hand, like, up on my belly here and was rubbing my belly around and he undid my belt buckle and put his hand down my pants and starting playing with my balls, my penis, and like trying to jack me off but it didn't work.

C.K. testified that he just froze and did not know what to do because Belina had previously threatened to fire him.

### (ii) B.C.'s Testimony

B.C., who was 18 years old at the time of trial, testified that he started working at the feedlot when he was 14 or 15 years old and that he worked there until 2022, when he was a high school junior. B.C. testified that during his employment at the feedlot, Belina gave him alcohol. He also testified to several incidents of sexual contact by Belina. B.C. corroborated C.K.'s testimony regarding the incident that happened when he, C.K., and Belina were checking cows. He stated that once they got to the field, Belina had him drive while Belina and C.K. were in the back of the pickup and "then a little bit through the drive he had us stop and he had [C.K.] drive and then I got into the backseat." B.C. testified that Belina asked him for a back massage, and "I didn't really know what to do there, so I kind of just rubbed his shoulders for a couple seconds, and then kind of just sat back over to the side of the door." B.C. testified that Belina then "started, like, rubbing on my shoulder and then went to my leg . . . And then he started rubbing my leg and then eventually . . . he went and undid my belt buckle and pants, and then reached in and started trying to jack me off." B.C. stated that he "didn't really know what to do. I was kind of just like shocked. I kind of froze."

B.C. also testified that, on another occasion, he, C.K., T.K., and Belina went to get a pickup about an hour away. Upon arriving, Belina asked B.C. to drive home after which Belina got in the backseat with C.K. Although B.C. could not see what was happening in the backseat, he heard what he thought was the sound of a belt buckle "tinging." B.C. testified that, following his interview with law enforcement and Belina's arrest, he was fired from the feedlot.

### (iii) T.S.' Testimony

T.S., who was 19 years old at the time of trial, testified that he started working at the feedlot in the summer of 2021 and quit approximately 3 weeks before Belina's arrest. T.S. testified that, in November or December 2021, Belina asked him for a back massage. Belina asked for another back massage sometime in 2022 after Belina's house burned down and Belina was living in a camper with his family. T.S. testified that Belina asked for the back massage after they returned from a 9-hour trip to McCook, Nebraska, at 3:00 a.m. T.S. stated that at that time, Belina offered him $100 to come into his camper and give him a backrub. T.S. testified that he believed that the backrubs meant more than just backrubs. T.S. testified that he declined Belina's requests and

Belina never tried anything sexual with him. T.S. testified that he quit working at the feedlot because he got tired of the way Belina did things.

### (iv) W.H.'s Testimony

W.H., who was 17 years old at the time of trial, testified that he worked at the feedlot from August 2021 to July 2022. W.H. testified that sometime in March or April 2022, Belina started rubbing his back and went to put his hand towards his crotch area and W.H. moved his hand away. W.H. testified that he told Belina that if Belina ever did that again he would quit. W.H. testified that, about a month after this incident, he told someone about Belina's attempt to touch his crotch area. W.H. testified that he quit the feedlot the day Belina was arrested.

### (b) Testimony by Mental Health Providers

### (i) Deb Milligan's Testimony

Milligan testified that she began treating C.K. in August 2022 after C.K. disclosed to his parents that he had been sexually assaulted. Over time, C.K. disclosed "a long pattern of inappropriate behavior" that began a few months after C.K. started working at Belina's feedlot. The inappropriate behavior "very gradually progressed over time to touching his genitals and some really inappropriate sexual behavior." Milligan testified that she observed, or C.K. informed her of, certain behaviors C.K. was exhibiting, including anger, angry outbursts, difficulty sleeping, stress, anxiety, difficulty focusing, nightmares, intrusive thoughts, self-image concerns, suicidal ideations, and a suicide attempt. Milligan testified that since beginning therapeutic treatment, C.K. "still has symptoms. He still has intrusive memories. He still may have some thoughts and beliefs around what happened that are not helpful for him that we want to continue to work on."

### (ii) Dana Kubo's Testimony

Kubo testified that B.C. was her client from December 2022 until June 2023. She testified that she helped B.C. understand some of the feelings of anger, guilt, and shame that he was experiencing. During her initial session with B.C., she completed an initial diagnostic interview with B.C. and that B.C. reported that his presenting problem or chief complaint was "he was sexually assaulted by his boss." Kubo testified that she observed specific behaviors during sessions with B.C., including that when it was an uncomfortable topic, B.C. would "come forward," "wring his fingers together," and "would bite his lip." Kubo testified that these observations led her to believe that B.C. was uncomfortable with the conversation and that B.C. was "dealing with some underlying feelings of some shame, and so through. . . the observations. . . you explore that a little further to see what is going on."

Kubo testified that B.C. described a specific incident that involved him and his friend in the truck with their boss where they had to exchange places in the truck and B.C. had to drive while his friend was being touched or molested in the backseat. Kubo further testified to B.C. discussing being ridiculed by other students at school for allowing the abuse to happen, how B.C. had been taken advantage of, how the abuse occurred on more than one occasion, and how he hoped the court case would just go away. B.C. ultimately stopped attending therapy against her advice because "he was not ready to deal with the emotional trauma of what had taken place."

Kubo then testified generally to the concepts of nondisclosure and delayed disclosures by victims, how children and adolescents disclose or report differently than adults, feelings of shame and anger in adolescent males, and that therapeutic intervention usually results from individuals experiencing behaviors or trouble in different aspects of their lives.

### (c) Testimony From Other Feedlot Employees

#### (i) Jeremy Siebrandt's Testimony

Jeremy Siebrandt, who was 43 years old, testified that he worked at Belina's feedlot for 3 or 4 weeks. Siebrandt testified that within a week of working at the feedlot, C.K. and B.C. started telling him "stories about what happened" with Belina. Siebrandt testified that during the time that he worked at the feedlot, he observed that alcohol provided by Belina was "kind of free for the taking" and that, on the evening of July 27, 2022, C.K. and W.H. were still at the feedlot when he left at about 5 p.m.

#### (ii) Tristan Bernhardt's Testimony

Tristan Bernhardt, who was 25 years old, testified that he worked at the feedlot but was fired after Belina's arrest. Bernhardt testified that during the time he was employed at the feedlot, he became concerned with minors drinking alcohol and operating machinery. Bernhardt also testified that the boys talked to him and, at some point, he became aware of Belina's interactions with some of the boys. Although he never reported the allegations to law enforcement, he encouraged the boys to report the incidents to police.

Bernhardt testified to a specific incident that occurred when he and his wife invited the boys over for dinner. At some point during the night, someone made a joke about Belina touching B.C. which caused B.C. to become upset and storm out of the house. Bernhardt testified that he went and spoke with B.C. and B.C. began crying and discussed some of the incidents that occurred between Belina and B.C.

#### (iii) Austin Wickett's Testimony

Austin Wickett, who was 25 at the time of trial, testified that he was employed at Belina's feedlot for about 3 months, and left shortly after Belina's arrest. Wickett testified that the minors who worked at the feedlot "talked about that they were getting alcohol from [Belina] and there was always alcohol in the fridges at the feedlot." Wickett testified that he was present at Bernhardt's home and heard the joke about Belina touching B.C. that caused B.C. to cry and that he observed Bernhardt speaking with B.C.

Wickett testified that at some point during his employment, some of the older employees began having some concerns about behaviors between Belina and the younger kids and that some of the older employees encouraged the kids to report the incidents but that he did not believe that any of the employees who voiced concerns about Belina's interactions with the minor employees reported those concerns to law enforcement.

#### (iv) Ryan S.' Testimony

Ryan S., who was 17 years old at the time of trial, testified that he worked at the feedlot for about a year and a half after he finished 8th grade. Ryan testified that on one occasion at work,

he and Belina started wrestling and Belina ended up taking a shot at the upper right side of Ryan's crotch. Ryan testified that he told Belina that if he ever did that again, he would kill him. Ryan testified that he felt Belina's actions were intentional because he wrestled in thousands of matches and that had never happened before, but regardless of whether it was an accident, it caught him off guard.

### (v) Kobe T.'s Testimony

Kobe, who was 21 years old at the time of the trial, testified that he worked at the feedlot in the summer 2020, which preceded his senior year of high school. He testified that at one point, Belina sent him a shirtless photo that Belina had taken of himself. Kobe testified that during the period of time that he worked at the feedlot, Belina would give him hugs occasionally but "I didn't really think anything of it." Kobe stated that he never took offense to Belina's hugs, that Belina never asked him for a massage, never offered him money, and never tried touching him inappropriately.

### (d) Other Witnesses' Testimony

### (i) W.H.'s Mother's Testimony

W.H.'s mother testified that, after Belina's arrest, she told W.H. that he was no longer allowed to work at the feedlot. She also testified that, W.H. told her that Belina attempted to add him on Snapchat, which she reported to law enforcement.

### (ii) Carrie K.'s Testimony

Carrie, C.K.'s mother, testified consistent with C.K.'s testimony regarding his disclosure of the sexual contact by Belina to her and C.K.'s father. As relevant to this appeal, Carrie testified that when she went into C.K.'s room to speak to him:

> [C.K.] said -- he goes, you don't -- I can't take it anymore. And I said, what are you talking about? And then that's when he proceeded to tell me what had happened. That [Belina] had been touching him inappropriately. And that night he was telling me that he was on -- standing on the horse trailer -- or the edge of the trailer and that he had been rubbing him and up his shirt and stuff, and he goes I told you I'm done. I ain't doing this no more.

### (iii) Derek Renner's Testimony

Renner testified that he went to high school with Belina and that they were both on the basketball team. According to Renner, in 2014 the team made it to the state tournament and the team stayed at a hotel with two people assigned to each hotel room. Renner testified that he was assigned to share a room with Belina, and that at some point during the night, Renner woke up when Belina "had his hands in my pants through the waistband onto my front, making advancements towards my dick. He was not quite there yet but for -- for me sitting there and trying to figure out what was going on." Renner stated that Belina attempted "advancing again towards my dick. . . I rolled over onto my back and he pulled his hands out of pants." Renner testified that after he realized what was going on, he "got up and removed myself from the room immediately." Renner testified that he had a conversation with his coach the following day, and that after the team returned from the tournament, Renner spoke with the principal, superintendent, and athletic

director regarding the incident. Renner testified that the school handled the incident internally and he was unsure what happened after that point.

*(iv) Morgan G.'s Testimony*

Morgan G., who was 21 years old at the time of trial, testified that sometime in 2019, Belina added her on Snapchat. Morgan testified that a week after she accepted his request and added Belina on Snapchat, he sent her a picture of the outside of her house and told her to sneak out, go to McDonalds, and drive around with him. Morgan testified that Belina's Snapchat pictures got progressively worse, with Belina sending half-naked photos of himself, and he would ask her to give him back massages. Morgan testified that although she declined the requests, she believed the requests were for more than just back massages. She testified, "I thought it was for sex . . . I mean, no one just wants a back massage, and he offered me money for a back massage." Morgan acknowledged that she did not remove or block Belina on Snapchat and that they were still Snapchat friends at the time of trial.

*(v) Logan R.'s Testimony*

Logan R., who was 20 years old, testified he previously worked at the feedlot and that Belina's wife was "like a stepsister" to him. Roberts testified that he worked at the feedlot from his sophomore year in high school until sometime in 2022 when he was a high school senior. Logan testified that he and Morgan dated during high school and corroborated Morgan's testimony that Belina sent Morgan a half-naked photo of himself in the mirror and sent another photo of money with messages offering Morgan money to give him a massage.

*(vi) Makenna T.'s Testimony*

Makenna T., who was 22 years old, testified that in March 2019, when she was 17 years old, Belina contacted her on Facebook Messenger and Snapchat. Makenna testified that Belina sent her a picture of her house, told her sneak out, and stated that "we could do anything and everything." According to Makenna, after she stopped responding to Belina, he told her not to tell anybody.

*(vii) Allison L.'s Testimony*

Allison L., who was 18 years old at the time of trial, testified that when she was 15 years old, her family moved into a new home which was a few miles away from Belina's home. Shortly after moving into her new home, Belina added her on Snapchat and sent her a message saying, "hey, I'm your new neighbor -- or, hey, neighbor. I'm sure there [were] other words in there, and then it did mention that he would provide me with alcohol and vapes and a ride home if I needed it." Allison testified that Belina included a winky face emoji after the part about being able to give her a ride home. Allison testified that she politely said no thank you and removed Belina from her Snapchat.

Allison testified that even after receiving the messages from Belina, she still went to the feedlot on a handful of occasions to hang out with B.C. and C.K. She further testified that there were multiple occasions where they drank alcohol and on at least one occasion, Belina drank with them. Allison testified that at some point, she became worried about C.K. after noticing behavioral

changes, including C.K. not being as "chatty and friendly as he had been." Allison denied noticing B.C. display any concerning behavior.

### (viii) Roger M.'s Testimony

Roger M., who was 20 years old, testified that he is Tristan Bernhardt's brother and that he worked at the feedlot between October 2021 and July 2022. Roger testified that on one occasion when Tristan was out of town, he threw a party in Tristan's house, that Belina purchased the alcohol for his party, and that Belina stayed at the party for about an hour or so. Roger testified that he was fired following Belina's arrest.

### 3. JURY VERDICT AND SENTENCING

The jury convicted Belina of the charged offenses: two counts of knowing and intentional child abuse, two counts of third degree sexual assault, one count of attempted third degree sexual assault, and three counts of solicitation of a minor. Thereafter, the district court sentenced Belina to 30 months' imprisonment and 18 months of post-release supervision for each count of child abuse; 1 year of imprisonment for each count of third degree sexual assault; 3 months' imprisonment for attempted third-degree sexual assault; and 18 months' imprisonment and 12 months of post-release supervision for each count of solicitation of a minor. The sentences were ordered to run consecutively to each other. Belina now appeals from his convictions and is represented by new counsel.

### III. ASSIGNMENTS OF ERROR

Belina assigns, renumbered and restated, that (1) the district court erred in overruling his objections to the testimony of Milligan, Investigator Downey, and Kubo, which he claims validated the truth of C.K.'s and B.C.'s allegations; (2) the district court erred in failing to provide a limiting instruction after allowing, over objection, C.K.'s mother to testify to the details of C.K.'s first report; (3) the district court erred in its jury instructions by failing to include within the definition of coercion separate definitions of economic force and moral force related to the charges of third degree sexual assault; (4) the district court erred in failing to instruct the jury that, for purposes of third degree sexual assault, persons over the age of 14 may consent to sexual contact; (5) the evidence was insufficient to sustain his conviction of the third degree sexual assault of B.C. and his convictions of solicitation of a minor; (6) that § 28-320 (third degree assault) and Neb. Rev. Stat. § 28-318(8)(a)(i) (Cum. Supp. 2024) (defining "without consent") are unconstitutionally vague as applied because they failed to define "coercion"; (7) the district court erred in allowing the State to commit prosecutorial misconduct by allowing the prosecutor to make improper remarks during closing argument; and (8) his trial counsel was ineffective in failing to object and/or move to strike Kubo's testimony which he alleges bolstered B.C.'s credibility.

Belina argues, but does not assign as error, that "[t]he foregoing errors and misconduct are sufficiently prejudicial to require a new trial." Brief for appellant at 34. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued. *State v. Boppre*, 315 Neb. 203, 995 N.W.2d 28 (2023).

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Vazquez,* 319 Neb. 192, 21 N.W.3d 615 (2025). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Garcia*, 311 Neb. 648, 974 N.W.2d 305 (2022).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*.

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. TESTIMONY ALLEGEDLY VALIDATING VICTIMS' ALLEGATIONS

Belina first assigns as error that the district court erred in overruling his objections to the testimonies of Milligan, Kubo, and Investigator Downey, which he claims sought to "validate the truth of C.K.'s and B.C.'s allegations." Brief for appellant at 28. We will analyze the arguments as to each such person separately.

### (a) Milligan's Testimony

Belina argues that Milligan, C.K.'s therapist, testified regarding C.K.'s claims of abuse and his symptoms, but then improperly validated C.K.'s testimony "by suggesting C.K. was a '[child] who had been sexually assaulted,' that he was still suffering symptoms, and still needed treatment."

- 10 -

Brief for appellant at 29. During Milligan's testimony, Belina's counsel objected on foundation, Rule 702, and Rule 403 grounds, which objections were overruled by the district court.

On appeal, Belina argues that the court erred in allowing portions of Milligan's testimony on the basis that when expert testimony in a case involving minors goes beyond explaining the child's behaviors and asserts, directly or indirectly, that the child has in fact been abused, or that the child is telling the truth, such evidence goes too far, and its admission constitutes reversible error, citing *State v. Muhannad*, 286 Neb. 567, 837 N.W.2d 792 (2013). As this court explained in *State v. Doan*, 1 Neb. App. 484, 496, 498 N.W.2d 804, 812 (1993), which involved the issue of the permissible scope of expert testimony under Neb. Evid. R. 702, the court held "that in a prosecution for sexual assault of a child, an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated." In short, Belina argues that Milligan's testimony crossed that line. We disagree.

Milligan testified that she initially began treating C.K. in August 2022, after C.K. disclosed to his parents that he had been sexually assaulted. Over time, C.K. disclosed to her what she described as "a long pattern of inappropriate behavior" that began a few months after C.K. started working at Belina's feedlot and that "very gradually progressed over time to [Belina] touching [C.K.'s] genitals and some really inappropriate sexual behavior." Milligan testified that she observed, or C.K. informed her of, certain behaviors C.K. had exhibited, including angry outbursts, difficulty sleeping, stress, anxiety, difficulty focusing, nightmares, intrusive thoughts, self-image concerns, suicidal ideations, and a suicide attempt. Milligan testified that, despite receiving therapeutic treatment, C.K. "still has symptoms. He still has intrusive memories. He still may have some thoughts and beliefs around what happened that are not helpful for him that we want to continue to work on."

Based on our review of the record where Belina's counsel interposed objections, despite Belina's contentions on appeal, Milligan did not testify or suggest in her testimony that C.K. was credible or was a child who had been sexually assaulted. Milligan did not testify to the substance of C.K.'s statements nor did she offer an expert opinion on the credibility of C.K.'s statements made during their therapeutic sessions. Rather, Milligan testified regarding behaviors exhibited by C.K. and his need for continued therapeutic intervention. Because Milligan's testimony did not vouch for C.K.'s credibility or the truthfulness of the allegations, this claim fails.

(b) Kubo's Testimony

Similar to Belina's assignment and argument regarding Milligan's testimony, Belina contends that Kubo's testimony went beyond the scope of admissible expert testimony and constituted testimony which directly or indirectly expressed an opinion that B.C. was believable, that his testimony was credible, and that B.C.'s witness accounts had been validated.

During the trial, Kubo testified that B.C. was her client from December 2022 until June 2023, and that his presenting problem was that "he was sexually assaulted by his boss." Kubo testified that she helped B.C. understand some of the feelings of anger, guilt, and shame that he was experiencing, but that B.C. ultimately stopped attending therapy against her advice because "he was not ready to deal with the emotional trauma of what had taken place." Kubo testified to specific behaviors she observed during sessions with B.C., including that when it was an

uncomfortable topic, B.C. would "come forward," "would [w]ring his fingers together," and "would bite his lip." Kubo testified that these observations led her to believe that B.C. was uncomfortable with the conversation and that B.C. was "dealing with some underlying feelings of some shame, and so through . . . the observations. . . you explore that a little further to see what is going on."

Kubo then testified generally to delayed disclosures, feelings of shame, and anger in adolescent males, and that therapeutic intervention usually results from individuals experiencing behaviors or trouble in different aspects of their lives.

Although Belina contends that the scope of Kubo's testimony amounted to an opinion that B.C.'s testimony was believable, that B.C. was credible, and that his account of the sexual abuse was validated, we disagree. Kubo's testimony consisted of reporting B.C.'s disclosures, how he conducted himself during therapy sessions, and how she attempted to work with B.C. to get him to cope with his feelings. Additionally, she generally testified to the subjects of delayed disclosure in adolescent males, potential feelings and behaviors which may be exhibited, the scope of therapeutic treatment, and B.C.'s decision to discontinue therapy against her advice. After reviewing Kubo's testimony where Belina's counsel interposed objections, we find that Kubo did not give testimony which expressed an opinion that B.C. was believable, credible, or that his account of the sexual abuse had been validated. As such, we find that the district court did not err in allowing Kubo's testimony over Belina's objections.

### (c) Investigator Downey's Testimony

Finally, Belina argues that the district court erred in admitting testimony from Investigator Downey. Specifically, he argues that at the end of Downey's interview with victims C.K. and B.C., Downey recommended counseling for the witnesses because he was "concerned for the mental health and welfare of these two boys." Belina contends that this testimony constituted improper vouching of the allegations.

Based on our review of the record, Investigator Downey testified that following the interview with C.K. and B.C., he recommended that they attend counseling. There was no objection to this testimony. Downey then testified that he recommended counseling "because I was concerned for the mental health and welfare of these two boys." Belina objected to this testimony as being beyond the scope of cross-examination, which objection was overruled by the court. On appeal, Belina argues that the testimony was objectionable on a different ground than articulated to the court. Because Belina raised only a beyond-the-scope objection at trial, he cannot now claim that Downey's testimony constituted improper vouching of C.K. and B.C.'s testimony. On appeal, a party may not assert a different ground for an objection to the admission of evidence than was offered to the trial court. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011). This assignment of error fails.

### 2. LIMITING INSTRUCTION

Belina next assigns and argues that the district court erred in failing to provide a limiting instruction following testimony from C.K.'s mother, which Belina claims constituted inadmissible hearsay. Specifically, Belina argues that during trial, over his objections, C.K.'s mother testified to the details of C.K.'s statement that "Belina was rubbing up against [C.K.] by a horse trailer that

- 12 -

night and that C.K. said to him, 'I told you I'm done. I ain't doing this no more.'" C.K.'s mother testified that C.K. was "very upset" and appeared to be under the stress of a startling event when he made the statements.

Belina's specific argument is, pursuant to the Nebraska Supreme Court's dictates in *State v. Ford*, 279 Neb. 453, 463, 778 N.W.2d 473, 482 (2010), that

> a victim of a sexual assault may testify to a complaint regarding a sexual assault made within a reasonable time after it occurs, but not as to the details of the complaint. The defendant argues that . . . a limiting instruction must be given to advise the jury that testimony regarding the complaint is not to be considered as substantive evidence that the assault occurred.

The State counters by claiming that, in this instance, the statement made by C.K. to his mother did not require a limiting instruction because it fell under an exception to the hearsay rule. We agree.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801 (Cum. Supp. 2024). Hearsay is not admissible except as provided by the Nebraska Evidence Rules, other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Nebraska Supreme Court. See Neb. Rev. Stat. § 27-802 (Reissue 2016). Neb. Rev. Stat. § 27-803(2) (Cum. Supp. 2024) provides an exception to the hearsay rule when the statement offered was related to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. This is commonly referred to as the excited utterance exception to the hearsay rule. See § 27-803(2).

As the Nebraska Supreme Court explained in *State v. Nolt*, 298 Neb. 910, 929, 906 N.W.2d 309, 324-25 (2018):

> For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event. The key requirement is spontaneity, which requires a showing that the statements were made without time for conscious reflection.
>
> . . . .
>
> An excited utterance does not have to be contemporaneous with the exciting event. It may be subsequent to the event if there was not time for the exciting influence to lose its sway. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.

Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, whether the declarant spoke in response to questioning, and whether the statement was made without conscious reflection. *Id.*

Here, all three elements of the exception are met. On July 27, 2022, C.K. experienced a startling event, to wit, a sexual assault. His statements to his mother that night related to that event and were made while C.K. was still under the stress of the event as evidenced by C.K.'s "angry" and "upset" demeanor, his abnormal shaking, and the look of anger and pain in his eyes. C.K.'s

- 13 -

mother testified that after following C.K. to his bedroom, she observed that C.K. was sitting on the floor with his head between his legs, appeared to be angry and in pain, and was shaking. After asking C.K. what was wrong, C.K.'s mother testified over Belina's improper witness bolstering, hearsay, and 403 objections, that C.K. said:

> I can't take it anymore. And I said, what are you talking about? And then that's when he proceeded to tell me what had happened. That [Belina] had been touching him inappropriately. And that night he was telling me that he was on -- standing on the horse trailer -- or the edge of the trailer and that [Belina] had been rubbing him and up his shirt and stuff, and [C.K.] goes I told you I'm done. I ain't doing this no more.

Because C.K.'s mother's testimony was properly admitted under the excited utterance exception to the hearsay rule, no limiting instruction was necessary. This assignment of error fails.

### 3. ALLEGED ERROR RELATED TO JURY INSTRUCTION DEFINING "COERCION"

Belina next assigns as error that the district court erred in instructing the jury on the definition of coercion for the purposes of third degree sexual assault without including definitions of "economic force" and "moral force." The State argues that this claim is barred because Belina's argument on appeal differs from the argument he raised before the trial court. We agree with the State.

In its proposed jury instructions, the district court instructed the jury on the elements of third degree sexual assault, which properly provided that "a defendant violates the statute by subjecting a victim to sexual contact" "without the consent" of the victim. The court defined, in relevant part, that "without consent" means "the victim was compelled to submit due to the use or force or threat of force or coercion." And the district court further defined "coercion" to mean "overcoming free will by the use of physical force, threat of physical force, and/or other nonphysical forms of force such as economic or moral force." During the jury instruction conference, Belina's counsel objected to the court's proposed definition of "coercion," arguing that in *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018), the Nebraska Supreme Court addressed a jury instruction containing the word "coercion" and approved the instruction even though the instruction did not define "coercion." As such, Belina's counsel objected to the inclusion of a definition of coercion within the instructions submitted to the jury.

It is noteworthy that in *State v. McCurdy, supra*, the Nebraska Supreme Court, in explaining the meaning of the word "coercion," utilized the same definition Belina argues should not have been included in the instruction. Nevertheless, on appeal, Belina does not argue that the district court erred in including the definition of "coercion" within the jury instructions but instead argues that the court erred in failing to define "economic force" or "moral force" within the jury instructions. On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Having now attempted to argue a ground different than his objection at trial and having not provided a proposed jury instruction at trial, Belina's claims are barred from review.

Belina next argues that the district court erred in failing to instruct the jury that, for purposes of third degree sexual assault pursuant to § 28-320, persons over the age of 14 may consent to sexual contact. He argues that "the court's instructions left an impermissibly grave risk that jurors would find Belina guilty of sexual assault believing the alleged victims could not consent simply by virtue of their age." Brief for appellant at 24.

In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute. *State v. Swindle, supra.* Although the law does not require that a jury instruction track the exact language of the statute, using the specific language of a statute is an effective means of implementing the intent of the Legislature. *Id.* This practice provides the added benefits of easing the process of preparing jury instructions and creating certainty for trial courts that the jury has been provided the essential elements of an offense. *Id.* There is no prejudicial error necessitating reversal if the jury instructions, read together and taken as a whole, correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence. See *id.*

Here, Belina was charged with committing the offense of third degree sexual assault as set forth in § 28-320(1)(a) and (3), which provides that an individual commits the offense of third degree sexual assault if he or she subjected another person to sexual contact without consent of the victim and did not cause serious personal injury to the victim. The district court instructed the jury regarding the charges of third degree sexual assault in the language of the statute. Third degree sexual assault, as codified in § 28-320, does not include age as an element of the offense.

Although Belina's counsel did not object to the instructions regarding the specific elements of the offense of third degree sexual assault, he requested a jury instruction defining the age that an individual can consent to sexual contact. He argued that because the alleged victims did not voice a lack of consent, without a jury instruction on the age of consent, the jury could be misled to believe that the victims could not consent simply because they were minors at the time of the alleged incidents. Belina's trial counsel further argued that

> throughout the trial there has been ample testimony about kids drinking [underage]. The term "minor" is set forth in the jury instructions. My concern is that there is a potential for confusion that minor applies throughout the jury instructions and that the jury may be misled to believe that somebody as young as 15 or 16 is not allowed under to even engage in sexual contact to act if they wanted to with somebody of [Belina's] age.

In support of this request, Belina's counsel offered a proposed jury instruction which provided:

> The legal age where a person may legally consent to sexual contact in the State of Nebraska is 15 years old. However, attaining the age of 15 alone does not mean a person consented to sexual contact under the law, only that he or she has attained the age where he or she may choose to consent to sexual contact.

The State objected to Belina's proposed instruction, arguing that there was no legal age of consent in Nebraska.

The district court overruled Belina's request, stating:

I understand what you're trying to get at with the proposed instruction. However, I believe that it would be confusing to the jury. The allegations made under the elements of the sexual assault allegations do not involve age, and solely involve a commission of an act without consent of the other. . . . obviously without consent presumes that there may be consent, and so to add anything further I don't believe would clarify. I think it would be confusing to the jury as well.

Here, the district court instructed the jury in the language of the statute, which does not include age as an element. And as the district court correctly noted, the statute and instruction explicitly provide that sexual contact is only a crime if pursued without consent. See *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019) (when jury instructions as a whole are combined with body of evidence on record and clarification provided by prosecution in closing arguments, jury was not misled by ambiguous phrasing of instruction).

We further note that, during closing arguments, both the State and defense counsel addressed the issue of the ability of the alleged victims to consent to sexual contact. The State noted:

Then we have the sexual assault. Sexual assault, as I said, is just the touching. This doesn't really have an age thing on it. You know, the fact that children young or old has to do with vulnerability, age of consent is really important, but these were young people. These were young people in a position that were placed by their parents, by their school, the school [Future Farmers of America], the parents, whatever, in a place of authority with an authority figure.

. . . .

Age, as I said twice so I remember it, on the child abuse is 19, on the solicitation it's 18. That is, was a child under 19, 18, all these kids were at the eldest . . . 16 or 17 at the time.

Defense counsel also referenced age in closing arguments:

You're not going to see any element of these alleged sexual assaults that has to do with age. And that's because they're old enough to consent. So you have to determine whether or not there was consent and we'll talk about that more in a little bit. . . .

. . . .

. . . we know that when somebody resists these alleged advances, [Belina] stops. This all goes towards consent, which is a reasonable person's standard. It's not individualized based on the person alleging nonconsent.

. . . .

They were old enough to engage in what they did. They were five or six years younger than . . . Belina. If they consented, that is not a crime under the law. Whether you like the age difference or not, it's just not.

Later, during closing arguments, defense counsel stated, "Maybe this is a case where these two young men, specifically [C.K.] and [B.C.], did some stuff that was objectively consensual and

- 16 -

they're embarrassed about it because some people started making some pretty nasty comments, including some of the guys they worked with . . ."

Based upon our review, the jury instructions, read together as a whole, correctly stated the law, were not misleading, and adequately covered the issues supported by the pleadings and the evidence. Moreover, counsel's arguments to the jury foreclosed any concern that the jury could believe the victims were incapable of consent due to their ages. This assignment of error fails.

5. SUFFICIENCY OF EVIDENCE

Belina next assigns as error that the evidence was insufficient to support his conviction of the third degree sexual assault of B.C. and all three of his convictions of solicitation of a minor involving C.K., B.C., and T.S.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We will analyze Belina's claims of insufficient evidence independently.

(a) Third Degree Sexual Assault of B.C.

Belina first contends that the evidence was insufficient to sustain his conviction of the third degree sexual assault of B.C. because the evidence did not establish, beyond a reasonable doubt, that he engaged in sexual contact with B.C. without B.C.'s consent.

As charged, for the State to establish that Belina committed the offense of third degree sexual assault, it was required to prove, beyond a reasonable doubt, that Belina subjected B.C. to sexual contact without B.C.'s consent and did not cause serious personal injury to B.C. See § 28-320(1)(a) and (3). On appeal, Belina does not contest that he subjected B.C. to sexual contact. Belina only disputes that the evidence was insufficient to show that the sexual contact was without B.C.'s consent.

Neb. Rev. Stat. § 28-318(8) (Cum. Supp. 2024) defines "without consent" as follows:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so.

In the instant case, the evidence, when viewed in the light most favorable to the State, established that one evening after work, Belina, B.C., and C.K. were checking on some cows in a field when Belina told C.K. to drive the pickup while Belina and B.C. were in the backseat. B.C. testified that while in the backseat, Belina asked B.C. to give him a backrub. B.C. testified that he "rubbed [Belina's] shoulders for a couple seconds" and then moved to sit closer to the truck door away from Belina. As B.C. looked out of the truck's window, Belina moved closer to B.C., then rubbed B.C.'s shoulder and leg. B.C. testified that eventually, Belina undid B.C.'s belt buckle and pants and "reached in and started trying to jack me off." B.C. acknowledged that he did not remove Belina's hand or say anything to Belina. Instead, B.C. testified that he "kind of froze" because he was "shocked." B.C. testified that he never consented to this contact and Belina never asked for his consent. Further, B.C. stated that he did not see any other option to call for help.

As the Nebraska Supreme Court explained in *State v. McCurdy*, 301 Neb. 343, 355, 918 N.W.2d 292, 300-01 (2018):

> As we read § 28-318(8), in order to determine whether sexual activity was "without consent" of the alleged victim, one of the four alternatives set forth in subsection (a) must be shown. That is, it must be shown that either (1) the defendant compelled the victim to submit due to the use of force or threat of force or coercion, (2) the victim expressed a lack of consent through words, (3) the victim expressed a lack of consent through conduct, or (4) the defendant used deception to obtain consent.

As to § 28-318 (a)(i), the Nebraska Supreme Court further analyzed the meaning of being compelled to submit to sexual assault due to coercion. In recognizing that there was a lack of physical force in the record in *McCurdy*, the Nebraska Supreme Court analyzed whether the State Legislature's inclusion of the word "coercion" was meant to expand manners of compelling submission beyond physical force, and ultimately held:

> We have said that when interpreting a statute, no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. See *State v. Clemens*, *supra*. Section 28-318(8)(a)(i) includes "force," "threat of force," and "coercion" as separate manners of compelling submission. Because "force" and "threat of force" are both defined in § 28-318(9) in terms of physical force, we determine that "coercion" would be redundant and even superfluous in the context of § 28-318(8)(a)(i) if it were limited to physical force. Accordingly, we hold that "coercion" in § 28-318(8)(a)(i) includes nonphysical force.

*State v. McCurdy*, 301 Neb. at 358, 918 N.W.2d at 302.

Having determined that "coercion" under § 28-318(a)(i) included nonphysical forms of force, the Court then considered whether the evidence in the record supported a finding that the defendant compelled the victim to sexual contact due to the use of "coercion." In finding that it did, the Court stated that "[i]n reaching this conclusion, we have looked to cases from other jurisdictions in which courts have found that circumstances similar to those in the present case supported a conviction for sexual assault." *State v. McCurdy*, 301 Neb. at 358, 918 N.W.2d at 302. In doing so, the Court stated:

> As we have indicated, courts have recognized that a psychological rather than physical force can support a conviction for sexual assault. See *State v. Watkins*, 92 A.3d

172, 186 (R.I. 2014) ("psychological coercion is sufficient to prove the force or coercion element of sexual assault, even in the absence of physical force"). Such psychological force or coercion has particularly been found in circumstances where abuse is carried out by adult authority figures in family or household settings.

For example, in *State v. Meyers*, 799 N.W.2d 132 (Iowa 2011), the defendant was charged with, inter alia, sexual abuse in the third degree; the alleged victim was the defendant's stepdaughter who was 17 years old at the time of the alleged abuse. The State in *Meyers* offered two alternative theories of sexual abuse under the relevant Iowa statute—that the defendant performed sex acts by force or "'against the will'" of the victim or, alternatively, that he performed sex acts at a time when the victim was suffering from a mental defect or incapacity. 799 N.W.2d at 140.

In interpreting the "against the will" language of the statute, the Iowa Supreme Court stated, "Clearly, the 'against the will of another' standard seeks to broadly protect persons from nonconsensual sex acts, even under circumstances showing the victim had no opportunity or ability to consent due to the inherently coercive nature of the circumstances." *Meyers*, 799 N.W.2d at 143 (emphasis supplied). The Iowa Supreme Court noted that under the statute, "physical resistance is not required 'to establish that an act of abuse is committed by force or against the will of a person'" and that instead, "'the circumstances surrounding the commission of the act' [must] be considered in determining whether the act was 'by force or against the will of the other.'" *Id.* at 142-43. In concluding that the evidence in *Meyers* supported a finding that the sex acts engaged in between the defendant and the victim were "'by force or against the will'" of the victim, the Iowa Supreme Court noted evidence of the totality of the circumstances, including, inter alia, "the disparity in age between [the defendant] and [the victim], the background and history of their relationship," and "the authority exercised by [the defendant]." 799 N.W.2d at 147.

The Iowa Supreme Court in *Meyers* also specifically concluded that "psychological force or inability to consent based on the relationship and circumstance of the participants may give rise to a conviction under the 'against the will' element" of sexual abuse. 799 N.W.2d at 146. The court looked to other jurisdictions in considering whether "psychological force" can establish sexual abuse. The court cited *Com. v. Rhodes*, 510 Pa. 537, 555, 510 A.2d 1217, 1226 (1986), in which the Pennsylvania Supreme Court determined that the Pennsylvania rape statute's reference to "'forcible compulsion'" included not only physical force or violence, "but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will." To determine if force had been used, the Pennsylvania Supreme Court focused on a totality of the circumstances analysis and cited various factors, including:

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. Id.

*State v. McCurdy*, 301 Neb. 343, 359-61, 918 N.W.2d 292, 303-04 (2018).

Although we recognize that the explicit holding in *McCurdy, supra*, was that "coercion" within the context of a family or household relationship between the minor and adult authority supported a finding that the defendant compelled the victim to submit to sexual penetration by use of "coercion," the Nebraska Supreme Court did not expressly limit its holding to a household setting. Instead, we read *McCurdy* as adopting a totality of circumstances test reflected in the cases cited by the Court to determine whether an individual's conduct amounted to nonphysical coercion. Applying that test to the case before us, we find that it does.

After reviewing the record, we conclude that the evidence in this case regarding the age disparity between Belina and B.C., who was a minor, Belina's position of authority as B.C.'s employer, the setting of the sexual contact in the back of the pickup truck in a remote area, and B.C.'s articulated distress during the encounter, was sufficient for a jury to find that, at the time relevant to the charge of third degree sexual assault, Belina compelled B.C. to submit to sexual contact by use of coercion, and therefore the sexual contact was without consent. Belina's assignment that the evidence was insufficient to support the conviction fails.

(b) Solicitation of a Minor

Next, Belina argues that the evidence was insufficient to support his three convictions for solicitation of a minor. He argues that, as to his convictions concerning C.K. and B.C., money paid after the alleged sexual contact does not support an element of the crime of solicitation of a minor. And regarding T.S., Belina contends that the alleged offer to pay T.S. money in exchange for a backrub was likewise insufficient to support a conviction.

Section 28-801.01(1) provides that "[a]ny person who solicits another person not his or her spouse to perform any act of sexual contact or sexual penetration, as those terms are defined in section 28-318, in exchange for money or other thing of value, commits solicitation of prostitution." And if the person solicited is under 18 years of age, the person violating the section is guilty of a Class IV felony. § 28-801.01(2)(a). The term "solicits" is not defined by statute and was not defined in the jury instructions. When terms in a statute are not specifically defined, those terms are generally given their plain and ordinary meaning. *State v. Clausen*, 318 Neb. 375, 15 N.W.3d 858 (2025). Again, we will analyze the claims of the sufficiency of the evidence independently.

*(i) Solicitation as to C.K. and B.C.*

As to the solicitation of C.K., Belina acknowledged that following both occasions that he had sexual contact with C.K., he provided him with cash. Likewise, B.C. testified that following the incident where Belina grabbed his penis while in the back of the pickup truck, Belina paid him cash. As to both such payments, Belina argues that solicitation of prostitution requires the solicitation of sexual contact in exchange for money. Because he argues that the provision of cash was provided after the contact as "hush money" and not in exchange for the sexual contact, the elements of solicitation were not met.

Belina's argument provides one possible explanation for his payment. That is, that he provided money to the victims to keep them from reporting his conduct. But another explanation is that he was demonstrating to both C.K. and B.C. that if they allowed Belina to have sexual contact with them, he would provide them with cash in the future. As we have said before, in a

challenge to the sufficiency of the evidence claim, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime beyond a reasonable doubt. Because we find that a reasonable trier of fact could have found that the payments to C.K. and B.C. were an attempt to solicit additional sexual contact in the future for additional money, we reject Belina's argument that there was no evidence of solicitation.

### (ii) Solicitation as to T.S.

Regarding Belina's conviction of solicitation of prostitution related to T.S., the evidence established that one morning at 3 a.m., Belina offered T.S. $100 to come to Belina's camper and give him a backrub. Although Belina argues that his request for a backrub was not an offer for sexual contact, the jury, using its own logic, experience and common sense, could draw inferences that an employer's request that an employee, with no special training in massage therapy, should come to his camper at 3 a.m. and give him a backrub was a request for sexual contact. There is no question that the State can prove a criminal offense by using circumstantial evidence; indeed, Nebraska appellate courts have recognized that a conviction can be based solely on circumstantial evidence. *State v. Clausen*, 318 Neb. 375, 15 N.W.3d 858 (2025). And here, the circumstantial evidence established that Belina asked for backrubs as a pretense to engage in sexual contact with the victims. Although a criminal conviction cannot be based upon speculation, it is generally recognized that triers of fact may rely on logic as well as their own experience and common sense to draw inferences based on circumstantial evidence. *State v. Clausen, supra*. Based on our review of this record, a jury could have reasonably concluded that Belina offered T.S. money in exchange for a sexual act.

### (c) Conclusion

In sum, we find that Belina's claims that the evidence was insufficient to support his conviction of the third degree sexual assault of B.C. and his three convictions for solicitation of a minor fail.

### 6. STATUTORY CHALLENGE AS APPLIED

Belina next assigns that §§ 28-320 (third degree assault) and 28-318(8)(a)(i) (defining "without consent") are unconstitutionally vague as applied because both statutes fail to define coercion. The State contends that Belina's assertion that the statutes are unconstitutional should not be addressed by this court because Belina failed to timely serve notice as required by Neb. Ct. App. P. § 2-109(E) (rev. 2025).

Section 2-109(E) provides that, in cases involving constitutional questions:

A party who asserts that a Nebraska statute is unconstitutional under the Nebraska Constitution or the U.S. Constitution must file and serve notice thereof with the Clerk. This notice requirement applies to an appellant, appellee, cross-appellant, or cross-appellee if it is the party asserting that a Nebraska statute is unconstitutional. Such notice may not be filed until the appeal is docketed. Such notice shall be filed by the party and accepted by the Clerk before the filing of the party's brief. If the Attorney General is not already a party or representing a party to the action, upon acceptance of the notice filed by the party, the

Clerk shall add the Attorney General to the case and provide notice of the filing to the Attorney General.

Here, Belina filed his brief for appellant on January 21, 2025, but did not file his notice that he was challenging the constitutionality of a statute until January 27. This failed to comply with § 2-109(E), which requires that the notice "must be filed by the party and accepted by the Clerk before the filing of the party's brief." As the Nebraska Supreme Court stated in *State v. Catlin*, 308 Neb. 294, 298, 953 N.W.2d 563, 567 (2021): "Without strict compliance with § 2-109(E), this court will not address a constitutional challenge to a statute. A litigant must strictly comply with § 2-109(E) whenever the litigant challenges the constitutionality of a statute, 'regardless of how that constitutional challenge may be characterized.'" And in circumstances similar to the instant case, the Nebraska Supreme Court declined to address constitutional challenges based upon the failure to comply with § 2-109(E). See, *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024) (declining to address constitutional question where notice filed 1 day after filing of appellate brief); *State v. McDowell*, 246 Neb. 692, 522 N.W.2d 738 (1994) (declining to address constitutional challenge where notice filed at time of filing of reply brief). Based upon Belina's failure to comply with § 2-109(E), we decline to address his claims of the unconstitutionality, as applied, of §§ 28-320 and 28-318(8)(a)(i).

### 7. PROSECUTORIAL MISCONDUCT

Belina next assigns as error that the district court erred in "allowing the prosecutor to argue during closing arguments that lawyers are bad people that do 'bad stuff' and that defense counsel intentionally attempted to 'confuse,' 'trick,' 'fool,' and mislead the alleged victims and jurors."

In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument. *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

Here, Belina's counsel did not object at any point during the State's closing argument, did not object after the conclusion of the State's closing argument, and did not make an objection related to lawyers doing bad things or trying to trick, fool or mislead alleged victims or jurors either during or after the conclusion of the State's rebuttal, or after the jury instructions were read to the jury. Defense counsel's only objections during the State's closing argument and rebuttal came during the State's rebuttal when counsel objected that the State was improperly burden shifting and that the State was going outside the scope of the State and defense's closing arguments. As such, Belina did not preserve for appeal issues to which he did not object at trial.

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019), *disapproved on other grounds, State v. Hagens*, 320 Neb 65, __ N.W.3d __. An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*.

A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id*. In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *Id.* It is then

necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.*

Having reviewed the entirety of the State's closing argument and rebuttal, and finding no plain error, we find that this assignment of error fails.

### 8. INEFFECTIVE ASSISTANCE OF COUNSEL

Belina's final assignment of error that his trial counsel was ineffective in failing to object and/or move to strike Kubo's testimony, which he claims bolstered B.C.'s credibility. He argues that counsel was aware of this court's opinion in *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993), which held that it is improper for a witness to testify regarding another witness's credibility. He admits that counsel did object to portions of Kubo's testimony "to protect against improper expert testimony." Brief for appellant at 30. However, he then argues that "[i]nexplicably, . . . defense counsel seemed to 'throw in the towel' during [Kubo's] testimony and failed to object or move to strike the inadmissible testimony complained of." Brief for appellant at 30-31.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question under the standard of review. *Id*. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Clark, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

In Belina's brief, he fails to identify what specific portions of Kubo's testimony that his trial counsel should have objected to. We note that the record reflects that trial counsel objected during Kubo's testimony five times, with two of those objections specifically based on *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993). Belina fails to identify what other objectionable testimony counsel should have objected to but did not. It is not the duty of an appellate court to scour the record in search of facts that might support an appellant's claim. *State v. Bedford*, 31 Neb. App. 339, 980 N.W.2d 451 (2022). Accordingly, we do not address this assigned error for having failed to state the claim with sufficient specificity.

## VI. CONCLUSION

Having considered and rejected Belina's assignments of error, we affirm his convictions and sentences.

AFFIRMED.